584 A.2d 734

John D. FAULKNER, Jr., et al.

v.

AMERICAN CASUALTY COMPANY OF
READING, PA., et al.

No. 459, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Jan. 22, 1991.

596

598

---

Walter G. Birkel (Brian P. Phelan and Conlon, Frantz, Phelan & Knapp, on the brief), Washington, D.C., for appellant Faulkner.

John R. Fornaciari (Robert M. Disch, Eckert Seamans, Cherin & Mellott, Washington, D.C., David L. Jacobson and Blades & Rosenfeld, Baltimore, on the brief), for appellant, Billman.

Howard J. Sedran (Arnold Levin, Fred S. Longer and Levin, Fishbein, Sedran & Berman, on the brief), Philadelphia, Pa., for appellant Brickley.

Michael P. Tone (Anne Fiedler, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., William A. Hylton, Jr., Deborah Farmer Minot and Hylton & Gonzales, on the brief), Baltimore, for appellee, American Cas.

T. Hardin Marion and Tydings & Rosenberg, Baltimore, on the brief, for MDIF and Community Sav.

Before BLOOM, KARWACKI and CATHELL, JJ.

BLOOM, Judge.

These three appeals in one record evolved from *Maryland Deposit Insurance Fund Corp. v. Billman, et al.*, an action brought by the Maryland Deposit Insurance Fund Corporation (MDIF), as receiver for Community Savings & Loan, Inc. (Community) against various officers, directors and corporate subsidiaries of Community. MDIF's complaint contained six counts alleging multiple incidents of negligence, misappropriation, and breach of fiduciary duties. In October, 1988, a jury in the Circuit Court for Montgomery County returned verdicts of several million dollars on each count in favor of MDIF against the various defendants. On appeal, we reversed the judgment and remanded the case for a new trial in light of the court's failure to declare a mistrial after the jury was allowed to consider documents not in evidence. *Billman v. Maryland Deposit Insurance Fund Corp.*, 80 Md.App. 333, 563 A.2d 1110 (1989). The Court of Appeals reversed our decision and reinstated the judgments that had been entered on the verdicts. *Maryland Deposit Insurance Fund Corp. v. Billman*, 321 Md. 3, 580 A.2d 1044 (1990).

Seeking to obtain at least partial satisfaction of the judgments it had obtained against Billman and the other defendants, MDIF brought this action against appellee, American Casualty Co. of Reading, Pa. (American Casualty), to recover the proceeds of a Directors' and Officers'

Liability Insurance Policy that American Casualty had issued to Community. In that action the Circuit Court for Montgomery County (Kaplan, J.) entered summary judgments in favor of American Casualty against appellants, John D. Faulkner, Thomas J. Billman, and Roger Brickley. These three appeals, which have nothing in common except that they involve questions of coverage under the same policy issued by appellee, are from those summary judgments.

## Background

### . Faulkner

Prior to trial in *MDIF v. Billman, et al.,* appellant John D. Faulkner, a former president and board member of Community, executed a settlement agreement with MDIF in which he assigned to MDIF all claims he had against American Casualty arising under the policy coverage but retained the right to assert against American Casualty claims for additional damages for negligence or bad faith in the settlement process. Nevertheless, he agreed to dismiss any such action at the request of MDIF and Community if they believed that his prosecution of such claim would interfere with their recovery of funds from American Casualty. Thereafter, MDIF entered into a settlement agreement with American Casualty in which MDIF agreed to compel Faulkner to dismiss any future action he may bring as an insured of American Casualty. Faulkner subsequently attempted to bring such an action; however, the trial court, relying on the language of the MDIF–Faulkner settlement agreement, awarded summary judgment to American Casualty. Arguing that summary judgment was inappropriate and that the court's construction of the settlement agreement violates public policy, Faulkner noted this appeal. Perceiving no reversible error, we shall affirm that judgment.

### Billman

Appellant Thomas J. Billman, a former officer and director of Community and a defendant in MDIF's suit

against American Casualty, filed a cross-claim against American Casualty, contending that he was entitled to insurance coverage to satisfy the judgment against him on Count I of the *MDIF v. Billman, et al.* complaint. He also sought immediate payment of costs incurred in defending the action. Finding that Count I of MDIF's complaint alleged acts that are excluded from insurance coverage, the court awarded summary judgment to American Casualty. In this appeal from that judgment, Billman asserts that a genuine dispute of material facts exists, thus rendering summary judgment inappropriate. We agree and shall reverse the award of summary judgment as to coverage. We shall affirm, however, that part of the judgment which denied Billman's request for immediate reimbursement of defense costs.

### Brickley

American Casualty filed a cross-claim in *MDIF v. American Casualty, et al.* As part of that cross-claim, brought against everyone who had brought an action against an officer or director of Community that could result in the insurer's liability under its insurance policy, American Casualty sought to establish an interpleader fund. Named as a defendant in that interpleader action was appellant Roger Brickley. As one of about 5,000 investors who had purchased units in a number of limited partnerships managed by Equity Programs Investment Corporation (EPIC), which was affiliated with Community, Brickley had instituted in the Federal District Court for the District of Maryland a class action against Billman and the other officers and directors of EPIC, who were defendants in *MDIF v. Billman, et al.*, as well as against Community, its subsidiaries, and other related corporations.

The trial court established an interpleader fund and set a deadline by which all claims against the funds were to be filed. Brickley failed to file any claim against the fund. The trial court subsequently ruled that Brickley's claims, as well as those of the class he represented, against the

insurance fund were barred. Further, the court ruled that, assuming Brickley's federal action is successful, no insurance coverage exists for the claims asserted in his complaint as a matter of law. Based on those rulings, the court granted American Casualty's motion for summary judgment on the issue of insurance coverage and released the interpleader funds to MDIF. Appealing from that summary judgment, Brickley asserts that the court's rulings were premature. We shall affirm the summary judgment barring Brickley's claim against the interpleader fund but reverse the judgment on the issue of insurance coverage.

Additional facts relating to each of the appeals will be set forth in the discussions relating to those appeals.

## I *The Faulkner Appeal*

On 17 May 1988, appellant John D. Faulkner (Faulkner) a former president and director of Community and a defendant in *MDIF v. Billman, et al.*, as well as in *MDIF v. American Casualty, et al.*, executed a settlement agreement with MDIF. The relevant portions of the agreement provide as follows:

3(a) Except as specifically set forth below, Faulkner hereby assigns, transfers and conveys to MDIF and Community all of his rights, title, and interest in, to, and under the Insurance Policy for the payment of all covered losses that American Casualty is obligated to pay on his behalf.

(b) Faulkner hereby retains, and does not assign, transfer or convey to MDIF and Community, any and all claims and causes of action that Faulkner may have against American Casualty beyond the limits of the Insurance Policy, with respect to American Casualty's conduct, actions or inactions, including, but not limited to, his claim for attorneys' fees, costs and expenses incurred in connection with the American Casualty Action, and any claim concerning American Casualty's failure or refusal to fund the settlement proposal made by MDIF and

Community to dismiss its claims against Faulkner in exchange for payment of $4,500,000.

(c) Faulkner shall bear the expense of the prosecution of any claims that he retains. *Faulkner agrees that he shall consult with counsel for MDIF and Community in his prosecution of any claims against American Casualty, and agrees that if prosecution of any such claim against American Casualty shall in the determination of MDIF and Community interfere with MDIF's and Community's recovery of any monies from American Casualty, then at MDIF's and Community's election, he shall either stay or dismiss such claims.* (Emphasis added.)

In April 1989, MDIF and Community executed a settlement agreement with American Casualty, the relevant portion of which provides:

6(b) MDIF and Community, as assignees of Faulkner's rights, if any, under the Insurance Policy:

(1) hereby assign those rights to American Casualty; and

(2) shall dismiss with prejudice and release all of the claims assigned by Faulkner to MDIF and Community.

(c) MDIF and Community, pursuant to paragraph 3(c) of their Settlement Agreement with Faulkner (Exhibit D), have determined that the prosecution of any claims by Faulkner against American Casualty would interfere with MDIF and Community's ability to enter into this Agreement; accordingly, MDIF and Community shall cause Faulkner to dismiss and/or abandon any other claim he has brought or may bring against American Casualty.

Thereafter, by a letter dated 8 September 1989, Faulkner advised the trial court of his intention to institute an action against American Casualty for its failure to negotiate in good faith with MDIF on his behalf. MDIF subsequently informed Faulkner that, pursuant to ¶ 3(c) of the Settlement Agreement between them, MDIF would require him to dismiss his bad faith claim against American Casualty. On

5 October 1989, American Casualty filed a Second Amendment by Interlineation to First Amended Cross-claim, in which it requested a declaratory judgment that Faulkner was precluded from pursuing any claim against it arising out of the insurance policy. American Casualty also filed a motion for summary judgment on that issue. The trial court granted American Casualty's motion for summary judgment on 7 February 1990 and dismissed, with prejudice, each of Faulkner's counterclaims.

It is Faulkner's contention that summary judgment was inappropriate because material facts concerning the scope and effect of the settlement agreement were in dispute. He also asserts that the trial court's construction of the agreement violates Maryland public policy.

### A. The MDIF–Faulkner Settlement Agreement

Faulkner's first contention is that summary judgment was inappropriate in light of a dispute as to the intentions of the parties at the time the agreement was executed. He further argues that the language of ¶ 3 of the agreement is ambiguous and that the court should have considered extrinsic evidence of his intent, pursuant to *Insel v. Solomon,* 63 Md.App. 384, 396, 492 A.2d 963 (1985) and *Della Ratta, Inc. v. Amer. B. Com. Developers,* 38 Md.App. 119, 130, 380 A.2d 627 (1977).

In ruling on a motion for summary judgment, a trial court must determine whether the pleadings, depositions, answers to interrogatories, admissions and affidavits on file show that there is no genuine dispute as to any material fact and whether the movant is entitled to judgment as a matter of law. Md. Rule 2–501(e). *See also Finci v. American Casualty,* 82 Md.App. 471, 478, 572 A.2d 1092 (1990); *Syme v. Marks Rentals, Inc.,* 70 Md.App. 235, 238, 520 A.2d 1110 (1987). In opposing American Casualty's motion for summary judgment, Faulkner offered his affidavit, and that of his attorney, Howard Possick, in which they set forth their intentions in negotiating the settlement

agreement with MDIF. Specifically, they claim that ¶ 3(c) was only intended to apply to contemporaneous actions by Faulkner against American Casualty and that it was never contemplated that the agreement would apply to claims filed after the resolution of MDIF's dispute with American Casualty. The affidavits, Faulkner argues, establish the existence of a genuine dispute concerning a material fact, thereby rendering summary judgment inappropriate. *Foy v. Prudential Insurance Co.*, 316 Md. 418, 422, 559 A.2d 371 (1989); *Sheets v. Chepko*, 83 Md.App. 44, 46, 573 A.2d 413 (1990).

The trial court, however, found the agreement clear and unambiguous. Further, the court found that Faulkner

knowingly and intelligently waived any claim against American Casualty by the clear language of the agreement which he signed. If MDIF decided or determined that it would injure them in their negotiations with American Casualty if Mr. Faulkner continued or proceeded with litigation against American Casualty, the determination was solely left in the hand of MDIF, their sole discretion. They did make that determination. That determination was that Mr. Faulkner would not proceed with litigation against American Casualty. I am not talking about litigation while they were negotiating or litigation after they negotiated. I am talking about litigation. That means any litigation as the insured under the American Casualty policy. There is absolutely no ambiguity in the language of the agreement.

We agree with the trial court's interpretation of the agreement and with its ruling.

Faulkner attempts to create an ambiguity in the agreement by arguing, in essence, that it fails to reflect the true intentions of the parties. While the subjective intent of the parties at the time the agreement was executed may be the subject of a dispute, that dispute does not concern any *material* fact. Maryland has long recognized the objective law of contracts, whereby contractual intent is determined in accordance with what a reasonable person in the position

of the parties at the time of the agreement would have intended by the language used. *Herget v. Herget,* 319 Md. 466, 470, 573 A.2d 798 (1990); *Aetna Cas. & Sur. v. Ins. Comm'r,* 293 Md. 409, 420, 445 A.2d 14 (1982); *Holloway v. Faw, Casson & Co.,* 78 Md.App. 205, 246, 552 A.2d 1311 (1989), *modified,* 319 Md. 324, 572 A.2d 510 (1990). Further, where the language of an agreement is unambiguous, the subjective intentions of the parties become irrelevant. As the Court of Appeals noted in *General Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985), "...the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean."

In the case *sub judice,* had the parties truly intended to limit the scope of ¶ 3(c) to claims filed by Faulkner that were contemporaneous with MDIF's action, the agreement could easily have been so worded as to express that intent clearly. It was not so worded, however, and the trial court properly rejected Faulkner's attempt to circumscribe the clear language of the agreement.

Faulkner contends that MDIF expanded the nature of the settlement agreement when it settled with American Casualty, agreeing to "dismiss with prejudice and release all of the claims assigned by Faulkner to MDIF and Community" and to "cause Faulkner to dismiss and/or abandon any other claim he has brought or may bring against American Casualty." Since the language of ¶ 3(c) of the settlement agreement provides that his claims may be dismissed or stayed if they are deemed to "interfere with MDIF's and Community's recovery of monies from American Casualty," Faulkner argues that these provisions cannot apply to claims asserted subsequent to the MDIF–American Casualty settlement. The obvious flaw in Faulkner's argument, however, lies in the language of ¶ 6(c) of the agreement between MDIF and American Casualty, in which it is evident that the possibility of a future claim by Faulkner presented a substantial obstacle to the settlement of MDIF's dispute with American Casualty. Thus, in order to

obtain a settlement, MDIF had to remove that obstacle and agree to exercise its right, pursuant to ¶ 3(c) of the MDIF–Faulkner settlement agreement, to require Faulkner to dismiss *any* claims he may bring against American Casualty. Faulkner is bound by the terms of the settlement agreement he executed; accordingly, the trial court's decision to award summary judgment to American Casualty was proper.

## B. Public Policy

■ Faulkner argues next that the trial court construed ¶ 3 of the settlement agreement as "tantamount to an unconditional assignment" of his claim for bad faith, in contravention of Maryland public policy. We disagree. Faulkner clearly retained the right to assert a claim against American Casualty for bad faith in ¶ 3(b) of the settlement agreement with MDIF. In retaining that right, however, Faulkner agreed that he would stay or dismiss his prosecution of any such claims at the sole discretion of MDIF and Community. Although Faulkner contends that these provisions only apply where required as a matter of law and not as a result of settlement negotiations between MDIF and American Casualty, no such distinction is indicated by the clear and unambiguous language of the agreement. In addressing the public policy concerns raised by Faulkner, the trial court stated:

> I tried to understand why his signing that agreement would be a violation of public policy. I just have not been able to ascertain just what the public policy is that it would violate. But I agree with Mr. Tone that if there is any public policy involved here, it is the public policy to encourage resolution of disputes by settlement or peaceable means rather than combative methods. There is no valid public policy claim on Mr. Faulkner's part here.

> As the court has indicated, he is a sophisticated banker, and this was not just something that came out of the blue. This case had been pending for a long time. He knew what he was getting out of when he signed the

agreement, which was favorable to him, because he was on the hook for a very substantial amount of money claimed by MDIF. If he wanted to spin the dice he could have done it, sat at the trial or not sat at the trial and just let it go and see what happens. He could have done it. That was his option.

We agree with the trial court that enforcement of the settlement agreement does not violate public policy.

Throughout his public policy argument, Faulkner refers to ¶ 3(c) of the settlement agreement as an impermissible attempt to effect an assignment of his claims for bad faith. He places significant emphasis on the Court of Appeals holding in *Bean v. Allstate*, 285 Md. 572, 403 A.2d 793 (1979), that, generally, a claimant has no direct cause of action against an insurer for sums in excess of the policy limit, absent "explicit authorization." *Id.* at 577, 403 A.2d 793. In *Bean*, an injured claimant sued an insurer for bad faith in failing to settle the claim within policy limits, arguing that he was a third party beneficiary of the insurance contract. Rejecting that argument, the Court adopted the view that an insurer owes no duty to a claimant to settle a claim; such obligations run only to the insured. *Id.* at 574–75, 403 A.2d 793. Thus, Faulkner argues that he could not have assigned his right to sue American Casualty for bad faith without "explicit authorization." *See Bean v. Allstate, supra,* 285 Md. at 577, 403 A.2d 793.

There are two basic fallacies in Faulkner's argument. First, *Bean v. Allstate* precludes an injured claimant from suing the tortfeasor's liability insurance carrier as a third party beneficiary of the insurance policy. It does not preclude the tortfeasor from asserting a claim against his own insurance carrier for bad faith or negligence in refusing or failing to settle the claim against him within policy limits. Nor does it preclude the tortfeasor from assigning his claim against his insurance carrier to a third person. Second, as discussed *supra,* ¶ 3(c) does not reflect any intention to assign Faulkner's claim for bad faith to MDIF. Rather, that claim was retained by Faulkner *sub-*

*ject to* his agreement to dismiss the prosecution of that claim at the discretion of MDIF and Community. The trial court correctly observed that the only public policy raised by the terms of the settlement agreement is that which encourages the peaceful and efficient resolution of disputes. This policy was succinctly articulated in *Chertkof v. Harry C. Weiskittel Co.*, 251 Md. 544, 550, 248 A.2d 373 (1968), *cert. denied*, 394 U.S. 974, 89 S.Ct. 1467, 22 L.Ed.2d 754 (1969), in which the Court of Appeals stated that "Courts look with favor upon the compromise or settlement of lawsuits in the interest of efficient and economical administration of justice and the lessening of friction and acrimony."

### C. *Unconscionability and Duress*

Faulkner's final assertion is that the settlement agreement, as construed by the trial court, is unconscionable and the product of duress. In support of this contention, Faulkner reiterates his belief that ¶ 3(c) constitutes an impermissible assignment of his claims against American Casualty for bad faith and that his agreement to stay or dismiss such claims at MDIF's request should only extend to actions that are contemporaneous with MDIF's negotiations with American Casualty. We have already addressed these arguments *supra.* It is sufficient to note at this point that had the parties intended to limit the effect of the settlement agreement, as Faulkner contends he did, the agreement should have so provided.

Significantly, Faulkner argues in his brief that:

In short, if the intended objective of Section 3(c) was— as the lower court found—to provide an election, at MDIF's and Community's sole discretion, of whether Faulkner could, in fact, actually exercise his expressly retained rights, the Agreement—contrary to its language—would have clearly provided for this result.

The agreement, however, does provide for this result in clear and unambiguous language.

■ The doctrine of unconscionability is defined in § 208 of the Restatement (Second) of Contracts as follows:

If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.

*See Williams v. Williams,* 306 Md. 332, 338, 508 A.2d 985 (1986). The ability of a court to alter the terms of a contract, however, is not without limitation. Speaking for this Court in *Martin v. Farber,* 68 Md.App. 137, 144, 510 A.2d 608, *cert. denied,* 308 Md. 237, 517 A.2d 1120 (1986), Chief Judge Gilbert noted

... the fairness of an agreement is to be determined as of the time it was made, not on the basis of conditions occurring subsequently. Courts are not possessed of unbridled discretion to undo that which the parties fairly and voluntarily assumed, even if the agreement might be deemed imprudent. (Citation omitted.)

With these principles in mind, we hold that the MDIF–Faulkner settlement agreement is not unconscionable. As the trial court observed, Faulkner faced the prospect of substantial personal liability at the time he executed the agreement. The agreement removed that prospect and provided for the payment of Faulkner's attorney's fees from proceeds recovered by MDIF for covered losses. Viewed in this light, the agreement is not only clear and unambiguous, but fair and reasonable.

■ Finally, Faulkner attempts to avoid enforcement of the settlement agreement by asserting that he executed the agreement under duress. In *Meredith v. Talbot County,* 80 Md.App. 174, 183, 560 A.2d 599 (1989), we stated:

[d]uress is essentially composed of the following two elements: (1) A wrongful act or threat by the opposite party to the transaction or by a third party of which the opposite party is aware and takes advantage, and (2) a state of mind in which the complaining party was over-

whelmed by fear and precluded from using free will or judgment.

Faulkner does not assert that MDIF committed any wrongful acts or that it was aware and took advantage of any wrongful acts perpetrated by American Casualty. Moreover, the basis of Faulkner's claim of duress is his assertion that the pending litigation adversely affected his emotional well-being; however, Faulkner has failed to establish any wrongful acts that deprived him of his free will at the time he executed the agreement. Anxiety arising from a pending civil action cannot, by itself, constitute duress sufficient to avoid enforcement of a settlement agreement. To hold otherwise would do violence to the policy of encouraging the fair and reasonable settlement of disputes. We hold, therefore, that the trial court properly enforced the MDIF–Faulkner settlement agreement in accordance with its clear and unambiguous terms. Accordingly, we affirm the award of summary judgment to American Casualty.

## II *The Billman Appeal*

Appellant Thomas J. Billman, a former officer and director of Community, filed a cross-claim against American Casualty in which he asserted that he was entitled to insurance coverage to satisfy the judgment against him on Count I of MDIF's complaint in *MDIF v. Billman, et al.,* and for costs incurred in defending the action. American Casualty, arguing that it was not required to provide coverage to Billman for any of the six counts alleged in the complaint, filed a motion for summary judgment. On 5 April 1989, the trial court awarded summary judgment to American Casualty on Counts II through VI. There is no challenge to the propriety of that ruling. Summary judgment was denied on Count I after MDIF opposed the motion, arguing that the conduct alleged by it against Billman in Count I was covered by the insurance policy and not fraudulent or otherwise excluded by policy provisions. American Casualty subsequently agreed to pay MDIF approximately $16 million in settlement of the action. There-

after, American Casualty filed a motion for reconsideration of the denial of summary judgment on Count I, which was opposed by Billman but, of course, not MDIF. On 3 May 1989, the court granted the motion for reconsideration and entered summary judgment against Billman on Count I, whereupon Billman noted this appeal.

### A. Summary Judgment

Billman contends that summary judgment on the issue of American Casualty's obligation to provide insurance coverage for the Count I verdict was inappropriate.[1] Count I alleged that the defendants in *MDIF v. Billman, et al.* breached their fiduciary duties of care and loyalty, as officers and directors of Community and that loans made by Community to Equity Programs Investment Corp. (EPIC), a wholly-owned subsidiary of Community, "inured to the personal benefit of defendants Billman and McCuistion." On this Count, the jury returned a verdict against the defendants for $49,255,381 in compensatory damages.

The insurance policy issued by American Casualty provided that coverage would extend to any "loss" for which the directors and officers, or any one of them, were legally obligated to pay as a result of a claim for a "wrongful act." The term "loss" is defined in ¶ 1(d) of the policy as including damages, judgments, settlements, costs and defense of legal actions, claims or proceedings and appeals therefrom, excluding matters deemed uninsurable under the law. The term "wrongful act" is defined in ¶ 1(e) of the policy as

any actual or alleged error, misstatement, misleading statement, act of omission or neglect or breach of duty by

---

1. Billman argues that since summary judgment had previously been granted in favor of a co-defendant (Cunningham) on the issue of insurance coverage, the court's decision to grant American Casualty summary judgment against him on this issue was contradictory and mandates a reversal. We disagree. In the case *sub judice* we are not concerned with the court's rulings regarding other defendants in *MDIF v. Billman, et al.;* rather, we are only concerned with whether the court erred with respect to Billman.

the Directors or Officers in the discharge of their duties solely in their capacity as Directors or Officers of the Association, individually or collectively, or any matter claimed against them solely by reason of their being Directors or Officers of the Association.

Paragraph 3(a)(2) of the policy provides that coverage does not extend to any loss resulting from a claim made against the Directors or Officers "based upon or attributable to their gaining in fact of any personal profit or advantage to which they were not legally entitled."

In support of its argument that summary judgment was properly entered, American Casualty relies extensively on the pleadings and arguments advanced in *MDIF v. Billman, et al.* American Casualty contends that the actions alleged in Count I of MDIF's complaint, and the judgment entered thereon, establish that Billman personally received profits to which he was not legally entitled, thus activating the terms of the exclusionary language of ¶ 3(a)(2) of the policy. This contention implicitly raises the issue of *res judicata.*

■ As Judge Wilner, writing for this Court in *Klein v. Whitehead,* 40 Md.App. 1, 389 A.2d 374, *cert. denied,* 283 Md. 734 (1978), explained, both *res judicata* and collateral estoppel are branches of a doctrine known as estoppel by judgment, *res judicata* being a direct estoppel and collateral estoppel being precisely what its name declares it to be. Although the requirement that there be an identity of parties, before estoppel by judgment may be asserted, has been somewhat relaxed, *see M.P.C., Inc. v. Kenny,* 279 Md. 29, 367 A.2d 486 (1977); *Pat Perusse Realty v. Lingo,* 249 Md. 33, 238 A.2d 100 (1968), we need not resolve this issue. The obvious obstacle to American Casualty's successful use of estoppel by judgment, whether *res judicata,* or collateral estoppel, in the case *sub judice* is the fact that the critical issue upon which the court's summary judgment ruling was based was never established in *MDIF v. Billman, et al.*

Count I of MDIF's complaint is entitled "Unlawful Loans to the EPIC Entities"; however, the allegations contained in Count I refer only to breach of fiduciary duties and actions that inured to the personal benefit of Billman. No allegation is made in Count I of MDIF's complaint that Billman acted fraudulently or received personal profits "to which he was not legally entitled." Indeed, in response to interrogatories propounded by American Casualty, MDIF stated that it did not claim that any officer or director of Community acted dishonestly or fraudulently. Thus, the doctrine of estoppel by judgment cannot support the trial court's ruling.

Md.Rule 2–501(a) permits any party to file "at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." In reviewing the law of summary judgment in another savings and loan case, Judge Wenner, writing for this Court in *Finci v. American Casualty,* 82 Md.App. 471, 572 A.2d 1092 (1990), observed:

> The summary judgment proceeding is not a substitute for a trial; rather, it is a proceeding to determine whether a trial is required to resolve a factual controversy. *Foy v. Prudential Insurance Co.,* 316 Md. 418, 422, 559 A.2d 371 (1989).
>
> . . . . .
>
> Once the moving party establishes sufficient grounds for summary judgment, the party opposing the motion must show "with some precision" that there exists a genuine dispute as to a material fact. *See Foy, supra,* 316 Md. at 422, 559 A.2d 371. Maryland courts have defined a "material fact" as "a fact the resolution of which will somehow affect the outcome of the case." *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985). If the facts are susceptible to more than one inference, all inferences must be resolved against the moving party. *Id. See also Syme v. Marks Rentals, Inc.,* 70 Md.App. 235, 239, 520 A.2d 1110 (1987). Moreover, where several

inferences may be drawn, summary judgment is not proper, but rather, the dispute must be submitted to the trier of fact. *King, supra,* 303 Md. at 111, 492 A.2d 608. *See also Foy, supra,* 316 Md. at 422–23, 559 A.2d 371. 82 Md.App. at 478, 572 A.2d 1092.

In the case *sub judice,* for summary judgment to have been appropriate American Casualty was obligated to show that, based upon the undisputed material facts, insurance coverage did not extend to the Count I judgment because of the "personal profit" exclusion in the policy. The record before the trial court did not establish this; rather, as outlined *supra,* the record revealed a genuine dispute between Billman and American Casualty on the central issue of insurance coverage. While American Casualty is certainly free to use the arguments advanced in *MDIF v. Billman, et al.* to support its position that Billman's conduct fell within the exclusion of coverage provisions of the policy, inasmuch as Billman disputes this position and in the absence of any judgment establishing this as a fact, there is no basis in the record to support the granting of summary judgment. The allegations of Count I set forth various breaches of fiduciary duties which are precisely the type of wrongful acts for which the insurance policy provides coverage. The absence of any judgment declaring that Billman received personal profits to which he was not legally entitled renders that material issue the subject of a genuine dispute. Consequently, we hold that the trial court erred in granting American Casualty summary judgment on the issue of whether insurance coverage extends to the judgment entered against Billman on Count I of MDIF's complaint.

## B. Defense Costs

Billman next contends that he is entitled to reimbursement from American Casualty for defense costs incurred in *MDIF v. Billman, et al.* Clause (a) of the policy provides that American Casualty agrees to pay all "loss" which any director or officer is legally obligated to pay. As noted

*supra,* the term "loss" is defined in the policy as including defense of legal actions. According to the terms of the policy, as long as the costs are incurred in defense of claims for covered "wrongful acts," American Casualty is obligated to pay such costs.

The Court of Appeals noted in *Pacific Indemnity v. Interstate Fire & Casualty,* 302 Md. 383, 388, 488 A.2d 486 (1985), that "an insurance contract, like any other contract is measured by its terms unless a statute, a regulation, or public policy is violated thereby." The policy in the case *sub judice* explicitly provides that defense costs of actions involving "wrongful acts" will be paid by appellee unless the ¶ 3 exclusion provision is applicable.

Billman relies extensively on *Little v. MGIC Indem. Corp.,* 836 F.2d 789 (3rd Cir.1987), and *Okada v. MGIC Indem. Corp.,* 823 F.2d 276 (9th Cir.1986), which involved Directors' and Officers' Liability Policies identical in all material respects to the American Casualty policy at issue. In both cases, the policies were held to be ambiguous in that they provided coverage for costs involved in "defense of legal actions" which the insureds were "legally obligated to pay," while allowing the insurer to retain discretion in deciding whether to advance expenses incurred prior to the disposition of claims made against the insureds. In the American Casualty policy, that ambiguity exists when clause (a), which provides coverage for any "loss" (including defense of legal actions) associated with a claim for a "Wrongful Act," which the insured is legally obligated to pay, is compared with ¶ 5(c), which gives American Casualty discretion in deciding whether to pay an insured's "expenses" prior to the disposition of claims.[2] In *Little, supra,* 836 F.2d at 793, the Third Circuit held:

---

**2.** ¶ 5(c) of the American Casualty policy provides:

The Insurer may at its option and upon request, advance on behalf of the Directors or Officers, or any of them, expenses which they have incurred in connection with claims made against them, prior to the disposition of such claims, provided always that in the event it is finally established the Insurer has no liability hereunder, such Di-

The language of section 1(D) is entirely consistent with the characterization of the policy as a liability policy. A "loss" is defined as an amount that the insured is "legally obligated to pay." Although this section does not explicitly speak to the timing of the insurer's duty to pay, the only reasonable interpretation is that this duty arises at the time the insured becomes "legally obligated to pay."

The Court further addressed the effect of ¶ 5(c) in holding that

Section 5(c) is, at best, extremely unclear in its attempt to modify the duty of contemporaneous payment imposed by section 1(D). Rather than explicitly negating this duty as to pre-disposition expenses in general, or as to defense costs in particular, section 5(c) modifies one affirmative representation of when the insurer will pay (the "legally obligated" language of section 1(D)) with *another* affirmative representation of when the insurer will pay (the option clause of section 5(c)). If MGIC's intent was to carve out an exception to section 1(D), it could have easily done so using alternative language that put the matter beyond reasonable question.

. . . . .

When a general clause clearly includes a particular item within its coverage and a specific clause does not clearly exclude it, the item is covered. In this case, section 1(D) clearly includes defense costs within the insurer's duty of contemporaneous payment, and section 5(c) fails clearly to exclude such costs from the scope of this duty. (Citation omitted.)

836 F.2d at 794–95. *See also Okada v. MGIC Indem. Corp., supra,* 823 F.2d at 281.

██ The Court of Appeals, however, in analyzing a similar policy which provided a form of Directors' and Officers' Liability Insurance to members of the Board of Education

---

rectors and Officers agree to repay to the Insurer, upon demand, all monies advanced by virtue of this provision.

for Charles County, reached a different result. In *Continental Casualty v. Board of Education*, 302 Md. 516, 530, 489 A.2d 536 (1985), the Court construed language identical to that contained in ¶ 5(c) of the American Casualty policy as giving the insurer the *option, but not the obligation* to advance expenses, including defense costs. We hold, therefore, that Billman's entitlement to defense costs extends only to his defense of claims for which coverage is found to exist. No such finding has yet been made; consequently, he is not entitled to an immediate reimbursement of defense costs.

### C. Fugitive Appeal Doctrine

■ American Casualty argues that Billman's appeal should be dismissed pursuant to the Fugitive Appeal Doctrine since Billman was indicted on 30 January 1990 and has had a criminal complaint and arrest warrant pending against him since 1988. The origin and rationale for the Fugitive Appeal Doctrine, which prevents fugitives from seeking redress from the courts while simultaneously avoiding their jurisdiction, was explained by Chief Judge Gilbert in *Billman v. Md. Deposit Insurance Fund Corp.*, 80 Md.App. 333, 563 A.2d 1110 (1989). We feel it unnecessary to repeat that entire discussion here. It is sufficient to note, as Chief Judge Gilbert observed, that

Billman may or may not be considered a fugitive from justice. There is, we are told, a warrant for his arrest, but he certainly has not been convicted on that charge, and we are unwilling to divest a person of the right to seek redress by way of an appeal of a real or imagined wrong because a post-appeal warrant has been issued in another case for his apprehension.

 . . . . .

The Fugitive Appeal Doctrine is a severe one, requiring a thorough examination of public policy. If it is to be adopted in Maryland with respect to civil cases, the Court of Appeals should so declare. Absent that declaration, we deny MDIF's motion to dismiss the appeal. . . .

80 Md.App. at 346–47, 563 A.2d 1110.

We are of the same opinion today. Since the Court of Appeals has not declared the Fugitive Appeal Doctrine to be the law of Maryland, we deny American Casualty's motion to dismiss the appeal.

### III *The Brickley Action*

On 3 December 1986, appellant Roger Brickley filed a Consolidated Amended Class Action Complaint in the United States District Court for the District of Maryland against Equity Programs Investment Corp. (EPIC), an affiliate of Community, Community itself, and several of its officers and directors who also served as officers and directors of EPIC. Brickley's complaint alleged violations of the Securities Act, the Exchange Act, and the RICO statute and was an outgrowth of the collapse of Community and its subsidiaries, specifically EPIC, resulting in substantial losses to investors. Brickley had purchased $42,000 of EPIC Associates Limited Partnership, which had been formed to purchase groups of homes in development projects to obtain for the limited partners the benefits of appreciation in residential real estate values. The complaint alleged that the defendants fraudulently obtained substantial fees by overstating the values of the property owned by the partnership and by continuing to acquire more property despite an increasing mortgage debt that left the business overleveraged. When Community became unable to advance loans to EPIC to manage its mortgage debt, EPIC was forced to seek the protection of the bankruptcy laws and the limited partners lost their investments. Brickley filed the complaint personally and as a representative of all others similarly situated.

In the case *sub judice,* American Casualty filed, on 27 June 1986, a First Amended Cross-claim, seeking *inter alia* a declaration that the claims by MDIF were not covered by the Directors' and Officers' Liability Policy. Further, in Count 5 of the cross-claim, American Casualty brought an action in the nature of an interpleader to protect itself in

the event the court found that the claims of MDIF were covered by the policy. American Casualty requested the establishment of an interpleader fund of $5 million, which represents the liability limit of the policy, for payment of any and all claims against the officers and directors of Community for which coverage is found to exist.

In addition to the case *sub judice*, there were apparently seven other lawsuits, including Brickley's federal action, against Community, its subsidiaries and officers and directors. The cross-claim, presumably pursuant to Md.Rule 2–331(c), named Brickley as a cross-defendant for the purpose of American Casualty's request for an interpleader action. At the time he was served with the cross-claim, Brickley was acting as a representative of the class of limited partners in the federal action, although formal certification of the class did not occur until 13 October 1989.

On 2 September 1986 the Circuit Court for Montgomery County, after considering American Casualty's cross-claim, established an interpleader fund, required American Casualty to deposit $5 million into the fund, and set a deadline of 4 November 1986 for the filing of all claims that any party may have against the fund. Neither Brickley nor any member of the class he purported to represent filed such a claim. Consequently, on 24 February 1989, the court awarded American Casualty summary judgment against Brickley and ruled that Brickley, in his individual capacity and as representative of the class of EPIC limited partners, was barred from filing any claim against the interpleader fund. Further, the court ruled that any claim against the policy that had not been previously filed as an interpleader claim was barred.

American Casualty subsequently moved for summary judgment against Brickley, and the class he represented, on the issue of whether the claims asserted in the federal action were covered by the policy. On 7 March 1989, the court granted the motion, finding that ¶ 87 of Brickley's complaint, which alleged fraud and deceit, constituted the foundation for the entire federal action and that as a matter

of law, even if a judgment were recovered, there would be no insurance coverage under the policy. Thereafter, in May 1989, American Casualty moved for a release of the interpleader fund to MDIF. Brickley filed an opposition to the motion for release; however, on 2 June 1989 the court granted the motion and released the interpleader fund to MDIF.

Brickley appeals the court's order barring future interpleader claims, releasing the interpleader fund, and declaring that the insurance policy does not extend to the claims asserted in the federal action.

Brickley's appeal, therefore, is from the two separate, distinct, and only marginally connected orders: the 24 February 1989 order with respect to interpleader claims and the 7 March 1989 order granting summary judgment on coverage for the claims asserted in the federal court action.

### A. *Interpleader*

Brickley challenges the 24 February 1989 order on two grounds:

1. Elimination of the rights of a putative defendant class prior to notice to the class and prior to certification of the class violates due process.
2. Brickley, as well as the other EPIC limited partners did not have interpleader claims to assert.

### (1) Due Process

Brickley noted this appeal for himself only, not as representative of the class of some 5,000 limited partner investors. Nevertheless, he is now attempting to assert that persons who are not parties to this appeal were denied due process of law because the court eliminated their claims to a fund without notice to them and prior to the certification of a class action in the federal court.

█ Ordinarily, a person may not assert the constitutional rights of others. *Turner v. State*, 299 Md. 565, 571, 474 A.2d 1297 (1984). There are exceptions to the rule.

"When a relationship between a litigant and a third person is such that the enjoyment of the third person's rights are 'inextricably bound up with the activity the litigant wishes to pursue,' the litigant is 'very nearly, as effective a proponent of the right' as the third person; and the rights of the third person are likely to be ' "diluted or adversely affected," ' the general rule does not apply." *Id.* at 572, 474 A.2d 1297, citing numerous Supreme Court decisions permitting litigants to assert the constitutional rights of non-parties. We do not believe the relationship of appellant Brickley to the other members of the class of EPIC limited partnership investors comes within any of the relationships mentioned in *Turner* as to which the exception was applied, such as buyer and seller, physician and patient, distributor and distributee, association and its members, owner of real estate subject to racial restrictions and non–Caucasians, owner of private school and potential pupil, employer and employee.

Appellant Brickley cannot complain that he was denied due process, nor can he contend that any lack of notice to other class members adversely affected his own interests. We hold, therefore, that Brickley has no standing to complain of any lack of notice to others.

Moreover, Brickley at all times purported to represent the entire class of investors and eventually the federal court has recognized the suit brought by Brickley to be a class action. If in fact Brickley did represent the class, notice to him was notice to the class. If in fact he did not represent the class, other members of the class may have reason to assert that they were not properly barred on the basis of notice to Brickley. Those issues, however, are not before us; only the order of 24 February is before us as to its effect on appellant Brickley alone.

(2) Existence of Interpleader Claims

Brickley contends that the trial court erred in ruling that any claims against the interpleader fund not filed by the 4 November 1986 deadline were barred and in releasing the

interpleader fund to MDIF on 2 June 1989. Specifically, Brickley argues that since he did not obtain a liquidated judgment in the federal action prior to the deadline for filing an interpleader claim in the case *sub judice*, he did not have a "claim" that he could have asserted properly against the interpleader fund.

■ Md.Rule 2–221(a) provides, in pertinent part:

An action for interpleader or in the nature of interpleader may be brought against two or more adverse claimants who claim or may claim to be entitled to property. The claims of the several defendants or the title on which their claims depend need not have a common origin or be identical but may be adverse to and independent of each other.

The purpose of an interpleader action is to protect a stakeholder who is "threatened with double vexation in respect to one liability." *Rockwell v. Carroll Ptg. & Pub. Co.*, 191 Md. 542, 547, 62 A.2d 545 (1948). A decree cannot be entered in an interpleader action until all of the defendants have had an opportunity to answer or contest the interpleader complaint. *Id.; Miller v. Mass. Mutual Life Ins. Co.*, 183 Md. 19, 34, 36 A.2d 517 (1944). Once the defendants have had such an opportunity, Md.Rule 2–221(b) empowers the court to require the defendants to interplead as to the disputed property within a certain time period and to enjoin the original defendants from bringing or prosecuting any other action affecting the property.

■ Neither this Court, nor the Court of Appeals has held that a *claim* against an interpleader fund must be based upon a judgment. In support of his contention, Brickley relies solely on *Mitchell Properties v. Real Estate Title*, 62 Md.App. 473, 490 A.2d 271 (1985). His reliance on that case, however, is misplaced. In *Mitchell Properties* we held that the release of interpleader funds, which were also the subject of a pending case, was improper because the resolution of the interpleader action depended upon the outcome of the pending action. 62 Md.App. at 486, 490

A.2d 271. Contrary to Brickley's assertion, we did not hold that a judgment in the pending action was necessary before a claim to the interpleader fund could be asserted. Rather, we held that a final order disposing of the interpleader claims could not be entered until the pending litigation was resolved because that judgment would determine the validity of the claims already asserted. Obviously, in order to delay the disposition of an interpleader action until the resolution of a related action, a "claim" must be asserted against the interpleader fund. Indeed, a defendant in an interpleader action who fails to assert a claim against the subject property may be barred from asserting any future claim to that property. Md.Rule 2–221(b)(4).

Brickley fails to offer any authority to support the proposition that a claim against an interpleader fund must be based on a judgment. Nor does Brickley offer an explanation as to why he waited until after the deadline for filing interpleader claims before advancing this argument, rather than making a timely objection to the trial court's decision to set the deadline of 4 November 1986.

A "claim" is nothing more than an assertion of a right to certain property, and neither Md.Rule 2–221 nor the cases interpreting it has narrowed the definition of a claim to one that has been reduced to judgment. Significantly, in *Farmers & Mechanics Bank v. Walser*, 316 Md 366, 387, 558 A.2d 1208 (1989), the Court of Appeals held that a defendant in an interpleader action, who alleged that the stakeholder was independently liable to him, could not defeat the action simply by forsaking any claim to the fund deposited with the court. To hold otherwise, the Court noted, "would run contrary to the spirit and purpose of the interpleader rule." *Id.* at 388, 558 A.2d 1208. The independent liability alleged in *Walser, supra,* was not based upon a judgment; indeed, no action had yet been taken on that claim. Nevertheless, the Court of Appeals held that the defendant was required to assert a *claim* in the interpleader action.

In the case *sub judice,* Brickley could have asserted a timely claim against the interpleader fund. He then would

have been able to argue that the fund could not be released until his pending federal action is resolved. Brickley failed to take any action, however, until after the period for filing interpleader claims had expired. He is therefore bound by his decision to ignore the interpleader deadline. Thus, as to appellant Brickley, we affirm the trial court's ruling that any claims against the interpleader fund that were not filed by the deadline were barred and that the interpleader fund should be released to MDIF.

### B. The Summary Judgment of 7 March 1989

The policy in question provided, *inter alia*, that if, during the policy period, any claim or claims were made against the officers and directors of Community, individually or collectively, for a "wrongful act," American Casualty would pay on behalf of the officers and directors all "loss" which any of them should become obligated to pay.[3]

"Loss," as defined in the policy, meant such sums as officers and directors were legally obligated to pay for claims against them for "wrongful acts," including, but not limited to, damages, judgments, settlements, costs, and defense of legal actions, but not penalties or fines imposed by law or matters which may be deemed uninsurable.

The policy defined "wrongful acts" as any actual or alleged error, misstatement, misleading statement, act or omission, or neglect or breach of duty by officers and directors "in the discharge of their duties solely in their capacity as Directors or Officers of the Association [Community], individually or collectively, or any matter claimed against them solely by reason of their being Directors or Officers of the Association."

Expressly excluded from coverage were claims against officers and directors

---

**3.** The policy also insured Community itself against loss it may sustain by virtue of any requirement that it indemnify officers and directors on the basis of claims against them for wrongful acts. That aspect of the policy is not involved in this case.

(1) for libel or slander,

(2) based upon or attributable to their gaining in fact of any personal profit or advantage to which they were not legally entitled,

· · · · ·

(5) brought about or contributed to by the dishonesty of the Directors or Officers. However, notwithstanding the foregoing, the Directors or Officers shall be protected under the terms of this policy as to any claims upon which suit may be brought against them, by reason of any alleged dishonesty on the part of the Directors or Officers, unless a judgment or other final adjudication thereof adverse to the Directors or Officers shall establish that acts of active and deliberate dishonesty committed by the Directors or Officers with actual dishonest purpose and intent were material to the cause of action so adjudicated.

Based on the allegations of Brickley's complaint in the federal case, American Casualty moved for summary judgment against Brickley and the class of investors he represented. In a lengthy memorandum in support of its motion, American Casualty set forth two bases for ruling, as a matter of law, that it was not liable under the terms of its policy to Brickley and his group. The first basis was that one of the causes of action asserted by Brickley against directors and officers was for "wrongful acts" within the policy coverage. The second basis was that all of the claims against officers and directors came within policy exclusion No. 5, since they involved dishonesty, fraud and deceit.

The court granted American Casualty's motion. Brickley asserts that it erred in so doing "because a declaratory judgment regarding coverage is improper where the underlying litigation will decide many of the factual issues"; Brickley's complaint created a duty for American Casualty to defend its insureds; and it is improper for an insurer to seek a declaratory judgment that it has no obligation to

defend or indemnify claims asserted by a claimant against an insured.

▉ In support of his argument, Brickley cites *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842 (1975) and *Oweiss v. Erie Insurance Exchange*, 67 Md.App. 712, 509 A.2d 711 (1986), for the proposition that an insurance policy creates for the insurer the separate duty to defend in addition to the duty to indemnify, and the duty to defend is determined by a comparison of the complaint in the underlying tort action with the provisions of the policy. That principle simply has no applicability here. The Directors and Officers Liability Policy issued by American Casualty did not obligate the insurer to defend. As noted *supra*, it provided instead that American Casualty would pay all "loss" and then defined loss as costs of defense of legal actions so long as the costs are incurred in defense of claims for covered "wrongful acts." The carrier may, but is not obligated to, defend the action. If it does not, the insured will have to defend the action; and he will be entitled to recover from the insurer the cost of such defense if, but only if, the claim is for a covered "wrongful act." The obligation to pay defense costs, therefore, is coextensive with, not separate from, the obligation to indemnify.

We disagree, as did the circuit court, with Brickley's contention that the outcome of the litigation in the federal court will determine the insurer's liability under the policy. The court stated:

I have heard extensive argument ... and I am unconvinced that I couldn't decide these issues on the basis of the motion. If the allegations contained in paragraph 87 [4]

---

**4.** Paragraph 87 of Brickley's complaint in the federal court action was one of 114 paragraphs of general background information, covering the first 49 pages of the complaint, that were incorporated by reference in each of the 9 counts. Paragraph 87, the first of 26 numbered paragraphs (pages 29–49) under the heading of "Defendants' Misrepresentations, Omissions and Manipulative Acts," alleged:

In order to sell EPIC Limited Partnerships, defendants engaged in a series of acts, practices and a course of action the purpose of

were proved it would be no insurance coverage under the policy involved, and there would be no insurance coverage as a matter of law. The exclusions of the policy as a matter of law do not cover the wrongdoings that are alleged in the Brickley complaint. Accordingly, I will grant American Casualty's motion.

 In granting summary judgment on the basis of the second ground asserted by American Casualty in its motion for summary judgment—that the wrongful acts set forth in paragraph 87 of Brickley's complaint in the federal court action came within the coverage exclusions set forth in the policy—the court erred. The error, we believe, was understandable and induced by the ill-advised method of pleading adopted by Brickley. As we have noted, paragraph 87 of Brickley's complaint in the federal court action was one of 114 paragraphs occupying some 49 typewritten pages that were incorporated by reference in every single count of the nine count complaint. Each count, therefore, accused all of the defendants of fraud and deceit in the sale of EPIC Limited Partnerships to the plaintiffs and class members. To the extent that a cause of action is for harm caused by fraud and deceit, it would be excluded from coverage by virtue of paragraph (5) of the coverage exclusion provisions of the policy as a claim "brought about or contributed to by the dishonesty of the Directors or Officers."

Our perusal of the prolix pleading, however, leads us to the conclusion that despite the incorporation of Paragraph 87 into every count in the complaint, fraud and deceit are not the gravamen of each cause of action asserted. Paragraph 87, as is true of much of the verbosity of the first 49 pages of the complaint, must be deemed to be mere surplusage in various counts. In short, not all of the claims against Community's officers and directors are based upon a contention that they were "brought about or contributed

---

which was to operate as a fraud and deceit upon plaintiffs and the class members.

to by the dishonesty of the Directors or Officers," despite the language of Paragraph 87.

■ Our conclusion that the court erred in awarding summary judgment on the basis of the exclusion provisions of the policy does not end our inquiry, however. We must examine the record to determine if the court reached the right result, summary judgment in favor of American Casualty, albeit for the wrong reason. "[W]here the record in a case adequately demonstrates that a decision of the trial court was correct, although on a ground not relied upon by the trial court and perhaps not even raised by the parties, an appellate court will affirm." *Robeson v. State*, 285 Md. 498, 502, 403 A.2d 1221 (1979), *cert. denied*, 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980). *See also Burwell v. Easton Memorial Hosp.*, 83 Md.App. 684, 691, 577 A.2d 394 (1990).

■ American Casualty contended that none of the causes of action asserted by Brickley were for "wrongful acts" within the coverage of the policy because Brickley's claims against persons who were officers or directors of Community were not "solely by reason of their being Directors or Officers of the Association." Our review of the complaint reveals that American Casualty's assertion is not entirely accurate. With but one exception, all of the individual defendants in Brickley's federal court action who are sued in their capacities as officers and directors of Community are at the same time, and for the same causes of action, sued for acts and omissions attributable to other capacities, connections, and interests. One of the defendants in the federal court action is John D. Faulkner, Jr., who is being sued solely in his capacity as a former officer and director of Community and in the first count, at least, solely for acts or omissions as such officer and director. The first count asserts a claim against all defendants except James C. Jones and Fox & Company for alleged "Violation of section 10(b) of the Exchange Act and Rule 10b–5." Count I alleges, *inter alia*, that there was a scheme to

conceal from investors adverse material information about the businesses, finances, financial condition, and future business prospects of EPIC and certain institutions financially connected with EPIC, including Community. The scheme involved the making of untrue statements of material facts and failure to disclose other material facts, the effects of which operated as a fraud or deceit on investors in EPIC limited partnership units. Those individual defendants classified as "Director and Officer Defendants," including Faulkner, were accused of "knowingly and/or recklessly" issuing, causing to be issued, or participating in the issuance of, or aiding and abetting the preparation and issuance of public statements and reports that were materially false and misleading. Given a fair reading, Count I asserts a cause of action against John D. Faulkner, solely in his capacity as an officer and director of Community, for participating in a scheme to defraud investors by either knowingly or recklessly participating in the preparation and issuance of public statements and reports that were misleading. Had the allegation been merely that he *knowingly* participated, coverage might be deniable because of the exclusion from coverage of claims brought about or contributed to by the dishonesty of directors or officers. But, if Faulkner, as might be shown without variance from the pleading, acted *recklessly* instead of *knowingly*, the dishonesty exclusion would not apply and the claim would clearly be covered. A reckless, careless, negligent error, misstatement, misleading statement, act, or omission is within the definition of a "wrongful act," for which the policy provides coverage.

Since at least one count of the pending complaint in Brickley's federal court action states a claim against one of Community's officers and directors for conduct covered by the policy, and not within a policy exclusion, the court erred in granting summary judgment in favor of American Casualty against Brickley on the issue of insurance coverage. That judgment will be vacated.

JUDGMENT IN FAVOR OF APPELLEE AGAINST APPELLANT JOHN D. FAULKNER AFFIRMED.

JUDGMENT IN FAVOR OF APPELLEE AGAINST APPELLANT THOMAS J. BILLMAN VACATED.

JUDGMENT IN FAVOR OF APPELLEE AGAINST APPELLANT ROGER BRICKLEY AS TO INTERPLEADER FUND AFFIRMED.

JUDGMENT IN FAVOR OF APPELLEE AGAINST APPELLANT ROGER BRICKLEY AS TO INSURANCE COVERAGE VACATED.

COSTS TO BE PAID ONE–FOURTH BY APPELLANT FAULKNER, ONE–FOURTH BY APPELLANT BRICKLEY, AND ONE–HALF BY APPELLEE.