474 A.2d 1297
**Mary Rose TURNER**

v.

**STATE of Maryland.**

No. 79, Sept. Term, 1983.

Court of Appeals of Maryland.

May 24, 1984.

Joseph F. Murphy, Jr. and Russell J. White, Towson (Lynne Brueck, Towson, on the brief), for appellant.

Eleanor M. Carey, Deputy Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., and Jillyn K. Schulze, Asst. Atty. Gen., Baltimore, on the brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

DAVIDSON, Judge.

The principal question in this case is whether Maryland Code (1957, 1982 Repl.Vol.), Art. 27, §§ 152 and 153 (Female Sitters Law), which makes it unlawful to employ female sitters, is a violation of the Maryland Declaration of Rights, Art. 46, the Maryland Equal Rights Amendment (ERA). A second question concerns whether an employer of female sitters has standing to raise this question.

Article 46 of the Maryland Declaration of Rights provides:

"Equality of rights under the law shall not be abridged or denied because of sex."

Article 27, § 152 provides:

"*It shall be unlawful for any proprietor,* lessee or manager *of any variety entertainment or concert hall* (whether an admittance fee is charged or not), *to employ,* engage or allow any *female sitters* (or by whatever other name they may be called) in or about said entertainment or concert hall, building, room or premises; and all females who are allowed in or about the said premises who shall drink, smoke or partake of any kind of eatables or refreshments at the expense of others, or solicit others to purchase such things as may be purchased there, upon which they shall receive or expect to receive a commission, or who may be paid a regular salary therefor, or who participate in any way in the profits thereof, shall be deemed sitters under this section." (Emphasis added.)

Article 27, § 153 provides in pertinent part:

"Any person convicted of a violation of § 152 of this article shall be fined not less than two hundred dollars nor more than one thousand dollars, or be confined in jail or the house of correction for a period of not less than two months nor more than twelve months, or be both fined and imprisoned...."

The petitioner, Mary Rose Turner (employer), is the owner and manager of a tavern who employs female dancers to provide entertainment for the tavern's patrons. Certain contracts of employment entered into between the employer and certain female dancers required the dancers to circulate among the patrons and "produce sales."[1]

On 5 November 1982, members of the Maryland State Police, operating as undercover agents, entered the employer's tavern. During the evening, two females employed as

---

**1.** These contracts of employment provided in pertinent part:
"Any dancer failing to circulate and produce sales will be sent home and wages forfeited for entire night."

dancers sat down at a police officer's table. After engaging in conversation with them, the police officer bought some wine for each. Another officer observed an individual working behind the bar make entries on a ledger sheet indicating the number of drinks purchased for each female employee during the evening.

On 10 November 1982, the employer was arrested and charged with two violations of the Female Sitters Law. On 7 December 1982, in the District Court of Maryland sitting in St. Mary's County, the employer was convicted of both violations.

On 8 December 1982, the employer filed an appeal to the Circuit Court for St. Mary's County. There, the employer moved to dismiss the charges on the ground, among others, that the Female Sitters Law violated the Maryland ERA and the equal protection of the laws as guaranteed by the 14th Amendment to the United States Constitution and by Article 24 of the Maryland Declaration of Rights.

The State opposed the motion on the ground, among others, that the employer had no standing to challenge the constitutional validity of the statute. The State pointed out that under the statute both male and female employers could be prosecuted for employing female sitters and maintained that, consequently, the statute did not discriminate between male and female employers. The State concluded that under these circumstances the employer could not show that the statute adversely affected her constitutional rights. Additionally, the State opposed the motion on the ground that the Female Sitters Law did not violate the Maryland ERA or equal protection of laws guaranteed by the United States and Maryland Constitutions.

The Circuit Court recognized the general rule that a litigant has no standing to assert the constitutional rights of others. Additionally, the Circuit Court took judicial notice of the fact that males as well as females are now employed as sitters, thus recognizing that the constitutional rights of female sitters might be implicated. The Circuit

Court, however, then determined that, because the Female Sitters Law was neutral in its application to male and female employers and imposed the same burdens upon male and female employers, that law was constitutional.

On 16 May 1983, after a court trial, the employer was found guilty of two violations of the Female Sitters Law and was fined $500. The employer filed a petition for a writ of certiorari that we granted. In this Court, the State conceded that the employer had standing to challenge the Female Sitters Law and that the Female Sitters Law was unconstitutional under both the United States and the Maryland Constitutions. We agree that the employer has standing and that the statute violates the Maryland ERA. Accordingly, we shall reverse the judgment of the Circuit Court.

I

Standing

As a general rule, a person may not assert the constitutional rights of others. *See Joseph H. Munson Co. v. Secretary of State,* 294 Md. 160, 171, 448 A.2d 935, 941 (1982), *cert. granted,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983). More particularly, ordinarily in criminal prosecutions the accused has the right to assert the invalidity of the law upon which the prosecution is based. There must be a showing, however, that the accused's constitutional rights are adversely affected by the statute. It is not sufficient for the accused to show that the statute may impair the rights of others. Thus, ordinarily in a criminal prosecution involving an allegedly discriminatory statute, there must be a showing that the accused's constitutional rights are adversely affected by the complained of discrimination. *Clark v. State,* 284 Md. 260, 264–65, 396 A.2d 243, 246, *cert. denied,* 444 U.S. 858, 100 S.Ct. 119, 62 L.Ed.2d 77 (1979); *State v. Cherry,* 224 Md. 144, 155, 167 A.2d 328, 333 (1961); *State v. Case,* 132 Md. 269, 272, 103 A. 569, 570 (1918).

■ This Court has recently recognized that there are circumstances under which the general rule that a person may not assert the constitutional rights of others should not be applied. *Joseph H. Munson Co.,* 294 Md. at 171, 448 A.2d at 940. One factual element to be considered in determining whether the rule should apply in a particular case is the relationship of the litigant to the third person whose rights are being asserted. When a relationship between a litigant and a third person is such that the enjoyment of the third person's rights are "inextricably bound up with the activity the litigant wishes to pursue"; the litigant is "very nearly, as effective a proponent of the right" as the third person; and the rights of the third person are likely to be " 'diluted or adversely affected,' " the general rule does not apply. *Singleton v. Wulff,* 428 U.S. 106, 115–16, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976). *See, e.g., Carey v. Population Services International,* 431 U.S. 678, 684–85, 97 S.Ct. 2010, 2015, 52 L.Ed.2d 675 (1977) (seller permitted to assert buyer's constitutional rights); *Craig v. Boren,* 429 U.S. 190, 196, 97 S.Ct. 451, 455–56, 50 L.Ed.2d 397 (1976) (seller permitted to assert buyer's constitutional rights); *Singleton,* 428 U.S. at 115–16, 96 S.Ct. at 2874 (physicians permitted to assert patients' constitutional rights); *Eisenstadt v. Baird,* 405 U.S. 438, 445–46, 92 S.Ct. 1029, 1034, 31 L.Ed.2d 349 (1972) (distributor permitted to assert distributee's constitutional rights); *NAACP v. Alabama,* 357 U.S. 449, 458–59, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958) (association permitted to assert its members' constitutional rights); *Barrows v. Jackson,* 346 U.S. 249, 259, 73 S.Ct. 1031, 1036, 97 L.Ed. 1586 (1953) (owner of real estate subject to racial covenant permitted to assert non-caucasians' constitutional rights); *Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925) (owner of private school permitted to assert potential pupil's constitutional rights).

Indeed, as long ago as 1915, the Supreme Court recognized that a litigant may assert a third party's rights when the relationship between them is that of an employer and an

employee. *Truax v. Raich,* 239 U.S. 33, 38, 36 S.Ct. 7, 9, 60 L.Ed. 131 (1915). Similarly, in *Joseph H. Munson Co. v. Secretary of State,* 74 L.Ed.2d 949, 294 Md. 160, 171, 448 A.2d 935, 940 (1982), *cert. granted,* 456 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983), this Court has more recently said:

> "Although ordinarily one may not assert the constitutional rights of others, nevertheless where a statute is directed at persons with whom the plaintiff has a *business* or professional *relationship,* and impairs the plaintiff in that relationship with such other persons, thereby threatening real and immediate injury to the plaintiff, he is normally accorded standing to challenge the validity of the statute." (Emphasis added.)

The Female Sitters Law makes it unlawful for both males and females to employ female sitters and, therefore, cannot be challenged as violative of the Maryland ERA on the ground that it establishes a discriminatory classification based upon the sex of the employer. The statute however, prohibits the employment of females as sitters, but does not prohibit the employment of males and, therefore, can be challenged on the ground that it establishes a discriminatory classification based upon the sex of the employees. Manifestly, it is the employees', not the employers', constitutional rights that would be adversely affected by the allegedly discriminatory Female Sitters Law.

Here the record shows that the employer employs females as sitters. The Female Sitters Law is directed at third persons with whom the employer has a business relationship and it impairs the employer's relationship with her female employees. Moreover, in this case, the statute has not only threatened real and immediate injury to the employer, but has actually resulted in direct injury in the form of a criminal conviction and the imposition of a fine. Under these circumstances, the employer may assert the constitutional rights of her female employees. The employer has standing to challenge the validity of the Female Sitters Law.

## II

## Constitutionality of the Female Sitters Law

### A. The Maryland Equal Rights Amendment

This Court has consistently held that a law that imposes different benefits and different burdens upon persons based solely upon their sex violates the Maryland ERA. *See, e.g., Condore v. Prince George's County,* 289 Md. 516, 524, 425 A.2d 1011, 1015 (1981); *Kline v. Ansell,* 287 Md. 585, 593, 414 A.2d 929, 932 (1980); *Rand v. Rand,* 280 Md. 508, 513, 374 A.2d 900, 903 (1977). In *Rand v. Rand,* 280 Md. 508, 374 A.2d 900 (1977), we considered the impact of the Maryland ERA on the common law obligation of a father to support his minor children. Chief Judge Murphy, speaking for the Court, said:

"[W]e believe that the 'broad, sweeping, mandatory language' of the amendment is cogent evidence that the people of Maryland are fully committed to equal rights for men and women. The adoption of the E.R.A. in this state was intended to, and did, drastically alter traditional views of the validity of sex-based classifications." *Rand,* 280 Md. at 515–16, 374 A.2d at 904–05.

In explaining the effect of the Maryland ERA, Chief Judge Murphy quoted *Henderson v. Henderson,* 458 Pa. 97, 101, 327 A.2d 60, 62 (1974) (per curiam), which said:

" 'The thrust of the Equal Rights Amendment is to insure equality of rights under the law and to eliminate sex as a basis for distinction. The sex of citizens of this Commonwealth is no longer a permissible factor in the determination of their legal rights and legal responsibilities. *The law will not impose different benefits or different burdens upon the members of a society based on the fact that they may be man or woman.'* " *Rand,* 280 Md. at 513, 374 A.2d at 903 (emphasis added).

In *Kline v. Ansell,* 287 Md. 585, 414 A.2d 929 (1980), we considered the impact of the Maryland ERA upon the

common law cause of action for criminal conversation. There we said:

"At common law, the action for criminal conversation provided different benefits to and imposed different burdens upon men and women. Only a man could sue or be sued for criminal conversation. These facts remain unchanged under the common law as it exists in Maryland today. A man has a cause of action for criminal conversation, but a woman does not. Moreover, a man who engages in an act of sexual intercourse with another man's wife is civilly liable for damages, but a woman who engages in a similar activity with another woman's husband is not. *Thus, Maryland's law provides different benefits for and imposes different burdens upon its citizens based solely upon their sex. Such a result violates the ERA....* The common law cause of action for criminal conversation is a vestige of the past. It cannot be reconciled with our commitment to equality of the sexes." *Kline,* 287 Md. at 592–93, 414 A.2d at 933 (footnote omitted) (emphasis added).

In *Condore v. Prince George's County,* 289 Md. 516, 425 A.2d 1011 (1981), we considered the impact of the Maryland ERA upon the common law doctrine of necessaries. There we said:

"Under the common law of Maryland, prior to the adoption of the ERA, the husband had a legal duty to supply his wife with necessaries suitable to their station in life, but the wife had no corresponding obligation to support her husband, or supply him with necessaries, even if she had the financial means to do so.

⋅        ⋅        ⋅        ⋅        ⋅

"*[W]e think the common law doctrine of necessaries is predicated upon a sex-based classification which is unconstitutional under the ERA.*" *Condore,* 289 Md. at 520, 530, 425 A.2d at 1013, 1018 (emphasis added).

■ Here, the Female Sitters Law provides different benefits to and imposes different burdens upon men and wom-

en. Under the statute, a man can be employed as a sitter but a woman cannot. Moreover, an employer may employ male sitters but may not employ female sitters. Thus, Maryland's law provides different benefits to and imposes different burdens upon its citizens based solely upon sex. Such a result violates the Maryland ERA. The Female Sitters Law is a vestige of the past. It cannot be reconciled with our commitment to equality of the sexes. Accordingly, we now hold that the Female Sitters Law is unconstitutional.[2]

## B. Severability

Having determined that the Female Sitters Law is premised upon gender-based discrimination and is, therefore, unconstitutional, we shall additionally determine whether that statute should be invalidated in its entirety or its gender-based discrimination should be eliminated by severing the word "female," so that the prohibition against sitters would apply to both sexes. In making this determination, we shall apply established principles of severability.

The primary focus in questions of severability is legislative intent. The intent to be ascertained, however, is not actual legislative intent, as the Legislature obviously intended to enact the statute as written in its entirety. Rather, when severability is the issue, the courts must look to what would have been the intent of the legislative body, if it had known that the statute could be only partially effective. In determining this legislative intent, in addition to considering the legislative history of an act, courts apply certain established principles of construction. Perhaps the most important of these principles is the presumption, even in the absence of an express clause or declaration, that a legislative body generally intends its enactments to be severed if possible. Moreover, when the dominant purpose

---

**2.** In view of our decision, we need not consider the contention that the Female Sitters Law violates the equal protection of the laws guaranteed by the United States and Maryland Constitutions.

of an enactment may largely be carried out, notwithstanding the statute's partial invalidity, courts will generally hold the valid portions severable and enforce them. Nevertheless, when the General Assembly enacts a prohibition with an excepted class that is subsequently found to be constitutionally infirm, ordinarily it will not be presumed that the General Assembly would have enacted the prohibition without the exception. Such a presumption would extend the prohibition to a class of persons whom the General Assembly clearly intended should not be reached. *Davis v. State,* 294 Md. 370, 383, 451 A.2d 107, 114 (1982); *Cities Service Co. v. Governor,* 290 Md. 553, 575, 431 A.2d 663, 675 (1981); *Wheeler v. State,* 281 Md. 593, 607, 380 A.2d 1052, 1061 (1977), *cert. denied,* 435 U.S. 997, 98 S.Ct. 1650, 56 L.Ed.2d 86 (1978); *State v. Schuller,* 280 Md. 305, 319, 372 A.2d 1076, 1083 (1977). We are persuaded by the legislative history of the Female Sitters Law that even if the dominant purpose of that law could be effectuated by severance, severance is inappropriate here.

The legislative history of the Female Sitters Law indicates that the presumption in favor of severability is not applicable here. The Maryland ERA was ratified in 1972. In recognition of the questionable constitutionality of a variety of statutes, between 1972 and 1974, a number of bills were introduced in the General Assembly seeking to remove sex discrimination from the codified law. Four of these bills related to the Female Sitters Law. Their purpose was to provide for the word "female" to be deleted from the statute so that the prohibition against sitters would apply to both sexes. S.B. 121 (1974); S.B. 385 (1973); S.B. 435 (1972); H.B. 1464 (1973). None of these bills was enacted.

In 1973, then Governor Marvin Mandel established a commission for the purpose of implementing the Maryland ERA. By April 1974, the Governor's Commission to Study Implementation of the Equal Rights Amendment (Commission) had determined that "[d]espite the enactment of over 50 bills removing sex discrimination between 1972 and 1974,

there remains a large body of statutory law which makes distinctions based on sex." The Commission "compiled a list of all the areas which might be affected by the Equal Rights Amendment." Governor's Commission to Study Implementation of the ERA, *Report to the Governor*, pt. 2, A (1978). The Commission assigned "priority status" to certain topics based upon five factors:

"(1) The likelihood that a law would be declared unconstitutional under the ERA and voided in its entirety; (2) The likelihood that the constitutionality of a particular law would be litigated; (3) The unfairness of the present law; (4) The simplicity of the subject matter; and (5) The perceived public interest and public impact of a particular law." *Report to the Governor*, pt. 2, B.

The Female Sitters Law was among the topics selected for "priority status." *Report to the Governor*, pt. 2, B.

Before making recommendations as to the legislative changes necessary to implement the Maryland ERA, the Commission considered whether a statute based upon an impermissible distinction between males or females "should be invalidated or extended to apply to both sexes." In making this determination, the Commission examined "the historical basis of each sexually discriminatory law" and decided that when the public policy embodied in a statute was no longer "applicable to present conditions" or promoted sexual stereotyping, it should be abolished. *Report to the Governor*, pt. 2, O. After completing its study, the Commission, in September 1974, recommended that the Female Sitters Law be abolished. *Report to the Governor*, app. C.

There can be no question but that the General Assembly was aware of the Commission's report and, therefore, the questionable constitutionality of the Female Sitters Law. Indeed, in 1975, S.B. 536 was introduced for the purpose of abolishing the Female Sitters Law. Simultaneously, S.B. 95 was introduced for the purpose of extending the prohibition against sitters to both sexes. Neither bill was enacted.

In 1976, S.B. 192 was introduced for the purpose of abolishing the Female Sitters Law. This bill was not enacted.

In 1977, this Court decided *Rand v. Rand*, 280 Md. 508, 513, 374 A.2d 900, 903 (1977). There we announced that Maryland law, which provided different benefits to and imposed different burdens upon Maryland's citizens based solely upon their sex, was violative of the Maryland ERA. Assumably, the General Assembly was aware of this decision and was, therefore, again alerted to the questionable constitutionality of laws such as the Female Sitters Law. *E.g., Board of Education of Garrett County v. Lendo*, 295 Md. 55, 63, 453 A.2d 1185, 1189 (1982); *Supervisor of Assessments of Anne Arundel County v. Southgate Harbor*, 279 Md. 586, 591–92, 369 A.2d 1053, 1056 (1977); *Herbert v. Gray*, 38 Md. 529, 532 (1873).

On 23 February 1978, S.B. 1066 was introduced for the purpose of extending the prohibition against sitters to both sexes. This bill was not enacted.

On 1 July 1978, the Commission issued its final report in which it recommended that legislation be introduced in certain areas in which it had not been successful in removing sex discrimination. With respect to the Female Sitters Law, the Commission noted:

"Repeated unsuccessful attempts since 1973 have also been made to remove sex discrimination from the law relating to female sitters. Attempts to extend the law to males (1973, 1974, 1975, 1978) as well as to abolish the crime (1975, 1976) have met with defeat." *Report to the Governor*, pt. 4.

The Commission then recommended that that law be amended by deleting the word "female" so that the prohibition against sitters would apply to both sexes. Although the General Assembly was again alerted to the questionable constitutionality of the Female Sitters Law, no such bill has subsequently been enacted.

■ In sum, the legislative history of the Female Sitters Law unequivocally demonstrates that since 1972 the General Assembly had substantial reason to know that that law was of questionable constitutionality. It further demonstrates that, notwithstanding this knowledge, on six occasions the General Assembly failed to delete the word "female" so that the prohibition against sitters would apply to both sexes, and on two occasions it failed to abolish the prohibition against sitters. Indeed, the General Assembly has not yet acted to eliminate the constitutional infirmity of the Female Sitters Law. Under these circumstances, the presumption in favor of severability is not applicable. It is impossible to conclude that the General Assembly would have intended the prohibition against sitters to apply to both sexes if it had known that the statute's gender-based discrimination against females was constitutionally invalid. Moreover, if the Female Sitters Law were severed by deleting the word "female" so that the prohibition against sitters would apply to both males and females, the prohibition against sitters would be extended to males, an otherwise excepted class. *See, e.g., Cities Service Co.,* 290 Md. at 576, 431 A.2d at 676; *Wheeler,* 281 Md. at 607, 380 A.2d at 1061; *Schuller,* 280 Md. at 319, 372 A.2d at 1083; *Storck v. Mayor of Baltimore,* 101 Md. 476, 486–87, 61 A. 330, 334 (1905). Accordingly, severance would be inappropriate here.

### III

### Conclusion

We here hold that the Female Sitters Law violates the Maryland ERA and is, therefore, unconstitutional and that its gender-based discrimination is not severable. Accordingly, the convictions must be reversed.[3]

---

**3.** In view of our decision, we need not consider the contention that the evidence was insufficient to support the convictions.

JUDGMENT OF THE CIRCUIT COURT FOR ST. MARY'S COUNTY REVERSED.  COSTS TO BE PAID BY ST. MARY'S COUNTY.