742 A.2d 6

**Todd Alan THARP**

v.

**STATE of Maryland.**

**No. 7049, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Dec. 6, 1999.

---

320

322

John J. Kopolow, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for appellee.

Submitted before HOLLANDER, THIEME, and JAMES
S. GETTY (Ret'd, Specially Assigned), JJ.

THIEME, Judge.

Appellant Todd Tharp was convicted by a jury in the Circuit
Court for Baltimore County of second degree murder and
robbery with a dangerous or deadly weapon. Tharp appeals
from his convictions and presents the following questions:

1. Did the trial judge err in refusing to give an instruction
   on the crime of accessory after the fact to murder?

2. Did the trial judge err in refusing to grant relief after
   prohibiting defense counsel from observing a co-defen-
   dant's trial as part of his preparation for Tharp's trial?

3. Did the trial judge err by preventing defense counsel
   from cross-examining the accomplice on the fact that his
   attorney was in the courtroom during his testimony?

4. Was the evidence legally insufficient to sustain the
   convictions for armed robbery and robbery?

We answer "no" to each of the questions.

### Facts

On March 28, 1997, at approximately 6:00 p.m., Baltimore
County Police were dispatched to a wooded area near a pond
in the vicinity of Route 40 and Jones Road. There they found
the dead body of Michael Keller. An Assistant Medical
Examiner performed an autopsy the next day; she testified
that Keller sustained nine stab wounds to the back. One stab
wound went completely through his left lung; another went
through his right lung. A stab wound to the front struck
Keller's heart and cut the aorta. A fourth wound went
through Keller's diaphragm and damaged his liver. Any of
these wounds by itself would have caused death within two
minutes; in combination they killed Keller in less than one
minute. The medical examiner also testified that Keller sus-
tained a one-inch deep cut to his throat; Keller was alive when
that non-fatal wound was inflicted.

Testimony at trial revealed that three individuals were involved in Keller's killing: Tharp, Keith Sellers, and William Minton. Minton testified for the State pursuant to a plea bargain, wherein he would plead guilty to second degree murder and the State would drop the first degree murder charge and recommend a thirty-year sentence.

At trial, Minton described Tharp and himself as "really close friends." At age 25, Tharp was five years older than Minton and "like an older brother to" him. Minton met Sellers just days before the murder of Keller and had not met Keller before that day.

According to Minton's testimony, Tharp and Sellers came to Minton's house on March 25, 1997. Sellers said he wanted to inflict a severe beating on Keller, his roommate, because Keller had been stealing from him and had not been contributing money toward rent or food. Sellers asked Minton to help him. Minton's understanding was that Keller would be taken to Delaware, where Tharp, Minton, and Sellers would assault him, take his money, and then leave him. They decided to move the location of the assault closer to home when Tharp and Sellers were paid by their employer later than expected.[1] On March 27th, Tharp and Minton examined the area near Jones Road and found it suitable for their attack on Keller.

Minton further testified that later that night, after Sellers told Keller about a party at Jones Field, Tharp, Minton, and Sellers took Keller to the Jones Road area. All four individuals walked down a dirt road to a pond. According to Minton's account of the incident, Minton was knocked over by Sellers, who had Keller in a bear hug. Sellers quickly had Keller face-down on the ground and was trying to handcuff his hands behind his back. Tharp stood by watching, even though Sellers asked for help. In response to Sellers's explanation for the attack, Keller said he would pay the money he owed. Sellers said it was too late. At that point, Tharp kicked Keller

---

1. Tharp, Sellers, and Keller worked together at Harford Sanitation. On this occasion, all three were paid later than they had anticipated.

in the ribs and the groin. Sellers kicked Keller in the face, head, and ribs and stomped on his back. Minton himself kicked Keller in the ribs, shoulder blade, and hip. Minton then claimed to have a sprained ankle and walked five to twenty feet away; he remained there with his back to the others. Minton heard Tharp, sounding startled and upset, say, "What the [f——] are you doing—are you crazy?" Minton turned around and saw Sellers stab Keller three times in the back.

Minton testified that he turned away and refused to look again, though he "heard the stabbing continue ... [a]bout six or seven more times." When Sellers asked Tharp to help him roll Keller over, Tharp refused and said, "Can't you just leave him alone? Haven't you done enough?" Minton heard stomping and kicking noises. Tharp then walked up to Minton and whispered, "Let's go." They tried to leave before Sellers noticed, but Sellers caught up with them. When the three were in the car, Minton noticed Sellers with Keller's necklace. The next day, Sellers said he had taken Keller's identification and left a crack vial and heroin or a similar substance on Keller's person so that the murder would appear drug-related.

Christina Torres, Tharp's girlfriend in March of 1997, also testified at the trial. She testified that on March 26th Tharp told her that after they got paid the next day, Tharp was going to drive Sellers and Keller into Delaware, where Sellers would kill Keller. Because they did not get paid the next day, however, the plan was changed to eliminate the drive to Delaware. According to Ms. Torres's testimony, Tharp said Keller was taken to a secluded spot in Maryland where Tharp "double-punched" him in the chest and slit his throat, Minton kicked him, and Sellers handcuffed, beat, and stabbed him.

Detective Jay Landsman took a statement from Tharp on the evening of March 29, 1997. According to that statement, as related by the detective, Tharp drove down Route 40 on the previous night with Sellers and Keller in his car. Sellers asked Tharp to pull over. When Tharp pulled over, Sellers and Keller got out of the car. Sellers told Tharp to "swing

back." Sellers and Keller then ran across Route 40, and "[a]ppellant drove to White Marsh Mall." He returned about an hour later. Seeing Sellers alone, Tharp asked, "[W]here is Mike?" Sellers said he was still in the woods and then entered Tharp's car. Tharp said he first learned of Keller's death from a Channel 13 news story he heard on the night of the murder.

On the afternoon of March 31 st, Landsman and two other officers arrested Tharp at his place of employment, the European Bus Company.[2] After Landsman read Tharp the *Miranda* warnings, Tharp asked if he needed a lawyer. Landsman responded that that was up to Tharp. During the ride to the station house, Tharp said to the officer that he would "tell [him] everything." Eventually, Tharp offered to show the officers where the knives were. He directed them to some woods behind a K–Mart store, where he had disposed of the knives and various other items the day after the incident. Among the items Tharp located for the officers were two knives and handcuffs used in the assault. Later, at police headquarters, Tharp was re-advised of his rights and waived them. He then gave a statement in which he explained that Sellers induced Keller to accompany himself (Sellers), Minton, and Tharp to a party. In the lengthy statement, Tharp described the attack in detail, stating, "I just wanted to put [Keller] out of his misery, so I cut his throat." Tharp said that the day after the attack, when he vacuumed his car, he found Keller's necklace and gave it to Sellers.

Throughout the trial, Tharp maintained that he believed Sellers only intended to fight Keller, not to kill him. Tharp testified that Sellers did not begin to stab Keller until after Tharp had walked about twelve feet away, and that eventually he screamed at Sellers to cease the stabbing. Moreover, Tharp said that he did not stab Keller's neck to "put him out of his misery," but because he was yielding to Sellers's commands to "do something." Tharp testified that he believed

---

**2.** The Monday after the attack, March 31 st, Tharp began a new job as a mechanic at the European Bus Company.

Keller was already dead when he stabbed his neck because Keller was not moving and had been stabbed many times.

## Discussion

### I.  Jury Instruction on Accessory After the Fact to Murder

■ The Court of Appeals has held that "the standard of review for jury instructions is that so long as the law is fairly covered by the jury instructions, reviewing courts should not disturb them." *Farley v. Allstate,* 355 Md. 34, 46, 733 A.2d 1014 (1999) (citing *Jacobson v. Julian,* 246 Md. 549, 561, 229 A.2d 108 (1967)).  Accordingly, Md. Rule 2–520, "Instructions to the jury," states in pertinent part:

(c) *How given.*  The Court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions on its own, or by combining any of these methods.  The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

*See also Myers v. Estate of Alessi,* 80 Md.App. 124, 132, 560 A.2d 59, *cert. denied,* 317 Md. 640, 566 A.2d 101 (1989) ("It is firmly established that under Md. Rule 2–520(c) a trial judge is not obligated to give a requested instruction if the matter is fairly covered in the instructions actually given.").

■ In reviewing the propriety of the court's refusal to give a requested jury instruction, we must examine "whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given." *Farley,* 355 Md. at 47, 733 A.2d 1014 (citing *Wegad v. Howard Street Jewelers,* 326 Md. 409, 414, 605 A.2d 123 (1992)).  The burden is on the complaining party to show both prejudice and error.  *Farley,* 355 Md. at 47, 733 A.2d 1014 (citing *Harris v. David S. Harris, P.A.,* 310 Md. 310, 319, 529 A.2d 356 (1987)).

■ In this case, defense counsel asked the trial court to instruct the jury on the crime of accessory after the fact to

murder. The request was not granted, and Tharp contends on appeal that denying the request was error. We disagree.

Under Maryland Rule 4–325(c), a trial judge shall, at the request of a party, "instruct the jury as to the applicable law." The rule imposes a duty on the court to instruct on any crime "so long as it [i]s a permissible verdict generated by the evidence." *Dishman v. State,* 352 Md. 279, 292, 721 A.2d 699 (1998). A verdict as to a particular crime is permissible if it was charged by the State. *See Dishman,* 352 Md. at 292, 721 A.2d 699 (citing *Ball v. State,* 347 Md. 156, 190, 699 A.2d 1170 (1997) (observing that Md. Rule 4–325(c) applies to a request to instruct on charged offenses but does not apply to a trial court's refusal to instruct on uncharged offenses)). Thus, our inquiry centers on whether the State charged Tharp as an accessory after the fact.

In this case, the State charged Tharp with murder using the statutory short-form set forth in the Maryland Code, which essentially relaxed the formal requirements for an indictment in homicide cases. Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 616. The statute provides:

In any indictment for murder or manslaughter, or for being an accessory thereto, it shall not be necessary to set forth the manner or means of death. It shall be sufficient to use a formula substantially to the following effect: That A.B., on the ..... day of ..... nineteen hundred and ....., at the county aforesaid, feloniously (wilfully and of deliberately premeditated malice aforethought) did kill (and murder) C.D. against the peace, government and dignity of the State.

■ The Court of Appeals held in *State v. Williamson,* 282 Md. 100, 110, 382 A.2d 588 (1978), *sentence vacated,* 284 Md. 212, 395 A.2d 496 (1979), that the use of the short-form indictment was sufficient to charge Williamson with being an accessory *before* the fact to her husband's murder. Tharp argues that the Court of Appeals, in its recent opinion in *Dishman,* 352 Md. at 292, 721 A.2d 699, concluded without holding in the case before it that a § 616 indictment also

charges accessory *after* the fact to murder. We find that Tharp's contention misconstrues the Court's analysis in *Dishman.*

In the *Dishman* case, the State charged Dishman with murder using the short-form indictment. The Court held that Dishman was then also charged with manslaughter, notwithstanding inclusion of the terms "deliberately" and "premeditated" in the indictment. 352 Md. at 287, 290, 721 A.2d 699. Accordingly, and because the evidence generated an issue of manslaughter, the trial court erred in refusing to propound a requested manslaughter instruction. *Id.* at 294–302, 721 A.2d 699. The Court noted that, "[a]lthough we do not address accessoryship in this appeal," the analysis would be the same for "the charge of being an accessory to murder." *Id.* at 290, 721 A.2d 699. The Court then cited *Williamson,* acknowledging in a parenthetical note that the issue in *Williamson* was accessory *before* the fact. The Court concluded that in *Dishman* the short-form indictment charged the defendant with first and second degree murder, manslaughter, and "with being an accessory to murder."

We find that *Dishman,* in which the Court expressly declined to address the accessory after the fact issue, does not establish that the short-form indictment includes an accessory *after* the fact charge. Indeed, the Court explicitly rejected such an argument, in dicta, in *Osborne v. State,* 304 Md. 323, 336, 499 A.2d 170 (1985). The Court explained:

> The State asserts that an accessory after the fact need not be specifically charged with that offense. In *State v. Williamson,* . . . we held that an accessory before the fact need not be named as such in an indictment. The Court reasoned that because the "distinction between accessories before the fact and principals continually grows more illusory," it is no longer necessary to require that one be specifically charged as accessory before the fact in an indictment. The rationale in *Williamson* does not hold true for accessoryship after the fact. As previously noted, accessoryship

after the fact is a distinct offense, separate from the principal crime.

*Id.* at 336, 499 A.2d 170.

As the State points out in its brief to this Court, "[t]he dicta in *Osborne,* that a short form indictment as set forth in Section 616 charges accessory before the fact to murder, but not accessory after the fact, finds abundant support in treatises considering the question." For example, Wharton's *The Law of Homicide* states:

And the offense of an accessory after the fact in homicide being distinctively his own, and not that of his principal, a charge of homicide does not include the offense of an accessory after the fact, even under statutes abolishing the distinction between principals and accessories; and a person indicted for homicide cannot be convicted of being an accessory after the fact.

Francis Wharton, *The Law of Homicide* § 68, at 86 (Frank H. Bowlby ed., 3d ed.1907). Similarly, Professor LaFave explained:

This development whereby the accessory after the fact is dealt with in a distinct way is a most appropriate one and does not conflict at all with the modern tendency to abolish the distinctions between principals in the first degree, principals in the second degree, and accessories before the fact. The later three types of offenders have all played a part in the commission of the crime and are quite appropriately held accountable for its commission. The accessory after the fact, on the other hand, had no part in causing the crime; his offense is instead that of interfering with the processes of justice and is best dealt with in those terms.

2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law,* § 6.9, at 170 (1986) (footnote omitted).[3]

---

3. We note in passing that Maryland remains the only state in the country to retain the common law distinction between principals and accessories before the fact. *See State v. Sowell,* 353 Md. 713, 735, 728 A.2d 712 (1999) (Raker, J., concurring). In the context of this case, however, this distinction is irrelevant.

We find that the State did not charge Tharp as an accessory after the fact in the short-form indictment. Therefore, a verdict on that crime would not have been permissible. As the requested instruction was not a correct exposition of the law as applied in this case, the trial court did not err in refusing to instruct the jury as to accessory after the fact. *See Farley,* 355 Md. at 47, 733 A.2d 1014; *Dishman,* 352 Md. at 292, 721 A.2d 699; *Ball,* 347 Md. at 190, 699 A.2d 1170.

## II. Exclusion Order

Tharp next argues that the court erred in denying him relief in the form of a dismissal or a new trial after prohibiting defense counsel from observing co-defendant Sellers's trial approximately one year earlier.[4] Tharp contends that sequestering defense counsel during Sellers's trial hampered counsel's trial preparation in Tharp's case, and thus violated fundamental fairness and due process of law. We disagree.

Sellers listed Tharp's attorney, Edward Barry, as a potential defense witness in his trial. Sellers's attorney, Mr. Santini, moved for sequestration of witnesses, but excepted Mr. Barry from the motion. The court left the decision to the prosecutor, Mr. Meyer,[5] as to whether or not Mr. Barry would be allowed to attend Sellers's trial. Mr. Meyer did not want Mr. Barry present; accordingly, the court ordered him to leave the courtroom.

The next day, Mr. Barry asked the court to reconsider the exclusion order. The court again declined to permit Mr. Barry to be present in the courtroom. In the alternative, Mr. Barry requested an order allowing him to depose those witnesses who testified in the Sellers case and would later testify in Tharp's case. He argued that this would give him the pretrial benefit of seeing and hearing those witnesses testify, an opportunity he otherwise would not have in light of the exclusion order. This request was denied.

---

4. The same judge presided at both trials.

5. Mr. Meyer was the prosecutor in both Sellers's and Tharp's trials.

After unsuccessfully arguing in the Sellers case that he should not be sequestered, Mr. Barry raised the issue in a pretrial motion in Tharp's case. First, Mr. Barry moved to dismiss the charges against Tharp. The court denied the motion. In the alternative, Mr. Barry requested that he be permitted to depose the witnesses who testified in the Sellers case and would be called by the State to testify against Tharp in this case. The court denied this request as well.

On appeal, Tharp argues that dismissal "is the most appropriate remedy" because "the defense cannot recover what it was denied and the State provided, an opportunity to view the witness' initial testimony." As an alternative remedy on appeal, Tharp contends that "[a] retrial is necessary so that counsel may avail himself of the opportunity for trial preparation that was available to the State." Specifically, Tharp argues that because Mr. Barry was not given a chance to observe the witnesses in Sellers's trial "under deposition and then [to] utilize the information obtained" in Tharp's trial, a retrial is warranted.

Significantly, the only information this Court has regarding the sequestration order in Sellers's case is contained in the written transcript of the pretrial motions argument in this case. During that argument, Mr. Barry described in detail the circumstances surrounding the sequestration order. It is the parties' and the court's collective recollection of those circumstances that we set forth and rely on in this opinion.

During argument on the pretrial motion to dismiss, the following discussion ensued:

MR. BARRY: ... The Court will recall that this is the second trial in this matter. The first trial—this is the first trial of Mr. Tharp—Codefendant, Mr. Sellers, was tried approximately a year ago.

[A]t that time after the jury was selected, I attempted to sit in the courtroom to observe the witnesses and listen to the testimony. Mr. Santini, representing Mr. Sellers, had included my name among the potential witnesses in the case. That was so because it was his intention to call Mr. Tharp and have Mr. Tharp either testify or elect to take the

Fifth Amendment and elect not to testify ... On behalf of the Defendant in that case, Mr. Sellers, it was anticipated that I would be standing there with Mr. Tharp at that time as his lawyer. It was known by everyone concerned that I had absolutely no knowledge, no firsthand knowledge, no factual knowledge about the case. That I would be there and present only as Mr. Tharp's attorney in the matter.

Since I was listed in the matter, when the trial was prepared to commence[,] one of the attorneys, I believe, was Mr. Santini, made a Motion to Sequester. All witnesses were sequestered. Your Honor instructed me that I should leave, as well. I attempted to question that and indicate that I, uhm, was not a participant in the trial. Your Honor indicated that since I was on the witness list that I must leave. Mr. Santini then indicated that that would not be necessary, as far as the Defense was concerned. Your Honor said, well, then, it's up to Mr. Meyer [the prosecutor], whether he wants to have you present or not. Mr. Meyer said he's on the witness list; he, we do not excuse him from that, at which time your Honor ordered me to leave without permitting me to be heard on the question. The following day I was present in chambers with your Honor ...

At that time I asked the Court—I don't remember if I did it myself or if Mr. Santini asked your Honor to reconsider the order excluding me from the courtroom. Uhm, your Honor indicated that so long as the State was continuing to object to my presence that I would not be permitted to sit in the courtroom, and your Honor asked Mr. Meyer if he was still objecting. Mr. Meyer at that time said, and I, if this isn't a direct quote, it's very close, he indicated, Trials are a chess game. Checkmate. Now, I'm not sure I know what that means, but I took that to mean that he had the upper hand; it was his decision it was not going to do anything ... to jeopardize his case ... and in his opportunity to get a conviction against Mr. Tharp. He also said, as part of that same discussion, that Mr. Tharp's trial was coming up. That there would certainly be an advantage to my being in court. Then he said that bit about it's a chess game.

Your Honor, that's the wrong reason to exclude someone from the courtroom.... I agree with Mr. Meyer that there was a great strategic advantage to the State in Mr. Tharp's trial to exclude me from Mr. Sellers'[s] trial. Now, I could get a transcript and, in fact, I did, but there's a lot more that goes on in that trial than can be covered in a transcript—there's, there's how someone testifies, body language, credibility, those sorts of things.

... [T]here may be some disagreement about exactly what was said and, so, for all of those reasons, I think that there is a great disadvantage that came to Mr. Tharp because I was excluded from the courtroom, and I think I was excluded for the wrong reason. If it had been a question about a fair trial for Mr. Sellers I think this Court would have been required to do what it did and exclude me from the courtroom. But when the reasons for excluding me is to gain strategic advantage in this case which was coming up sometime in the future, that's the wrong reason. I would submit that it is prosecutorial misconduct and I would make a Motion to Dismiss at this time.

Mr. Meyer, the prosecutor, then responded. He stated that he wanted Mr. Barry sequestered in the Sellers case because Mr. Barry "was on the defense witness list." While Mr. Meyer admitted that "we really didn't know why he was on the list," he also indicated that "there was a long line of witnesses called by the Defense so it wouldn't have really surprised me if the Defense called Mr., tried to call Mr. Barry for some obscure reason." Thus, while acknowledging that the decision was partially tactical, the State maintained that Mr. Barry was excluded "in the case against Mr. Sellers" rather than in consideration of the case against Tharp.[6]

Mr. Barry then responded that as Tharp's counsel he had "a right to be there just as a citizen." He reiterated that there

---

6. Except for Mr. Meyer's offhand remark that trials are like a game of chess, arguably suggesting that the State had some strategic reason for excluding Mr. Barry, Tharp presents us with no indication that the State's opposition to his presence was in bad faith. Indeed, other than

was no reason for Mr. Santini or the State to call him as a witness in Sellers's trial, and stated that "Mr. Santini told the Court that I was not a fact witness, ... and at the time Mr. Meyer did not question that."

The court informed both parties that it had reviewed the sequestration order rule (Rule 5–615). On the basis of that rule, the court denied the Motion to Dismiss. In the alternative, Mr. Barry requested that he be permitted to depose each witness that testified in the Sellers case that the State intended to call in Tharp's case. The court also denied that request.

Finally, Mr. Barry reminded the court that he was excluded from the courtroom even after Tharp invoked his Fifth Amendment privilege not to testify in the Sellers case. With that information, Mr. Barry requested that the court "reconsider the previous rulings" as to the propriety of the sequestration order. The court stated:

> I don't have any independent recollection of any of that. It does not alter my conclusion that you were properly excluded when you were on a witness list for the Defense. I don't know exactly the context in which you asked me if you were excused permanently and I indicated yes. Certainly if your client was going away to the Baltimore County Bureau of Correction you weren't going to be needed any-

this isolated and ambiguous comment, nothing in the record remotely indicates that the State opposed Mr. Barry's presence in the courtroom for any reason other than that contemplated by the rule. *See Jones v. State,* 125 Md.App. 168, 724 A.2d 738 (1999) (" 'The purpose of the sequestration of witnesses has been said to be to prevent them from being taught or prompted by each other's testimony.' ") (*citing Redditt v. State,* 337 Md. 621, 628, 655 A.2d 390 (1995)).

We reiterate that the *defense* placed Mr. Barry's name on its witness list, and the *defense* requested that witnesses be sequestered. This was not a situation in which the State named an individual as a witness with no intention of calling that person to testify and then strategically moved to sequester witnesses for the sole purpose of keeping that person out of the courtroom. We caution that such a tactic would likely amount to bad faith as well as violate the canon of ethics. That is far from what occurred in this case, however, and accordingly we decline to address the issue of bad faith.

more to represent him but you were still on the witness list and we were in the Defendant's case at the time so, again, I don't think that anything that I have done in this case ... violated Rule 5–615 and will not grant relief requested.

Under the Maryland Rules, "exclusion of all witnesses other than the parties is mandatory if requested by either counsel prior to the beginning of testimony." *McGill v. Gore Dump Trailer,* 86 Md.App. 416, 421–22, 586 A.2d 829 (1991). If the request is made after testimony in the case has begun, the court may exercise its discretion in deciding whether to exclude witnesses on its own initiative or at the request of a party. *Id.* at 422, 586 A.2d 829. In particular, Md. Rule 5–615, concerning exclusion of witnesses in criminal cases, provides:

> (a) *In general.* Except as provided in sections (b) and (c) [7] of this Rule, upon the request of a party made before testimony begins, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses.... The court may order the exclusion of a witness on its own initiative or upon the request of a party at any time....

In this case, Mr. Barry was listed as a witness for the defense. Defense counsel moved for the exclusion of witnesses. Significantly, defense counsel then *excepted Mr. Barry from the motion.* The effect of this exception was to *remove Mr. Barry from the defense witness list.*[8] As Mr. Barry was not on the State's witness list, *he was no longer a witness in the case.* While Rule 5–615 permits the court to exclude witnesses on its own initiative, it does *not* authorize the court to exclude non-witnesses from the courtroom.[9] In-

---

7. The exceptions listed in subsections (b) and (c) are inapplicable in this case.

8. We reiterate that according to Mr. Barry's recollection of the events Mr. Santini told the court, upon excepting Mr. Barry from the motion to exclude, Mr. Barry was not a fact witness.

9. The rule also allows the court to exclude witnesses on motion of a party. In this case, the State did not move to exclude Mr. Barry.

deed, doing so without adequate justification may result in the denial of the defendant's right to a public trial.

Although we are not faced with a denial of Tharp's Sixth Amendment right to a public trial in the case *sub judice,* we will briefly address this issue because it lies at the heart of the court's error in excluding Mr. Barry from the courtroom in the Sellers case. This Court and the Court of Appeals have acknowledged that "[t]he Supreme Court has ardently protected a criminal defendant's right to a public trial...." *Watters v. State,* 328 Md. 38, 44–45, 612 A.2d 1288 (1992), *cert. denied,* 507 U.S. 1024, 113 S.Ct. 1832, 123 L.Ed.2d 460 (1993) (citing *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), and *Press–Enterprise Co. v. Superior Court of Cal.,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)); *see also Walker v. State,* 125 Md.App. 48, 67–69, 723 A.2d 922 (1999). This Court has also recognized, however, that "the accused's right to a public trial is not absolute." *Walker,* 125 Md.App. at 69, 723 A.2d 922; *see also Walker v. State,* 121 Md.App. 364, 370, 709 A.2d 177 (1998) (The privilege of the public to attend trials is not, however, unrestricted.). In *Walker,* 125 Md.App. at 69, 723 A.2d 922, this Court stated:

> [T]he Sixth Amendment does not require a court to forfeit its legitimate and substantial interest in maintaining security and order in the courtroom. To the contrary, prophylactic measures, including closure, may be warranted under some circumstances, in order to maintain order, to preserve the dignity of the court, and to meet the State's interests in safeguarding witnesses and protecting confidentiality.

The Supreme Court has identified several factors that are critical in deciding whether the trial court properly

---

Instead, in ruling on Mr. Santini's motion, the court deferred to the State's position. Therefore, Mr. Barry was not properly excluded "upon the request of a party," as provided in the rule. We note that, even if the State had moved to sequester Mr. Barry under Rule 5–615, granting such a motion would have been improper. As we have discussed, Mr. Barry was not named on the State's witness list, and had just been effectively removed from the defense witness list. Therefore, he was no longer a witness subject to the rule.

exercised its discretion in deciding whether to close a criminal proceeding to the public. Those factors include: (1) a party seeking closure "must advance an overriding interest that is likely to be prejudiced"; (2) "the closure must be no broader than necessary to protect that interest"; (3) "the trial court must consider reasonable alternatives to closing the proceeding"; and (4) the trial court "must make findings adequate to support the closure." *Waller,* 467 U.S. at 48, 104 S.Ct. 2210. As the Supreme Court further explained in *Press–Enterprise,* 464 U.S. at 510, 104 S.Ct. 819:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

Because Mr. Barry was no longer a witness when he was excepted from the motion to sequester, he was merely a member of the public. Although the trial court in the Sellers case did not close the courtroom to the entire public, this Court has held that even when the sequestration order is limited to relatively few individuals, such as the defendant's family, the right to a public trial may be violated. *See, e.g., Walker,* 121 Md.App. at 373, 709 A.2d 177. It follows, then, that even when the court excludes one member of the public from the courtroom, Sixth Amendment concerns may come into play.

In *Walker,* the court granted the State's motion to exclude the defendant's family from the courtroom during the two minor victims' testimony in a child sexual abuse case. *Id.* at 368–70, 709 A.2d 177. The Court acknowledged that the sequestration order did not "involve removal of all of the spectators from the courtroom. The public may only be excluded, however, 'pursuant to a narrowly tailored order necessary to protect an overriding State interest.' " *Id.* at 373, 709 A.2d 177. Because the trial court did not conduct "an examination to ascertain the accuracy or validity of the State's

proffer" that the victims were fearful of testifying against their mother's former boyfriend in the presence of his family, this Court held that the trial court abused its discretion. "It is incumbent upon the trial judge to make more than a general finding that all children suffer trauma when testifying.…"

In this case, the State articulated no overriding interest in excluding Mr. Barry from the courtroom, and the trial court made no findings to support the exclusion order. Nothing in the record suggests that, during the brief period of time when he was in the courtroom, Mr. Barry was in any way disruptive or otherwise interfering with the administration of justice so as to necessitate his removal. Therefore, the court may have violated the Sixth Amendment right to a public trial when it sequestered Mr. Barry in the Sellers case. At a minimum, the exclusion order was erroneous.

We reiterate that the potential Sixth Amendment error concerning the exclusion order occurred in Sellers's case, not in Tharp's. Thus, the question Tharp presents on appeal is whether, *in light of that error*, the court in his case erred in refusing to grant relief in the form of a dismissal or permission to depose the witnesses common to both cases. Tharp, correctly, does not claim that his Sixth Amendment right to a public trial was violated; instead, he argues that the court violated fundamental fairness and due process of law.[10] We disagree.

There is no provision in the Maryland Constitution, Maryland Rules, or statutes of this state that requires or even explicitly permits the taking of pre-trial depositions of the State's witnesses in criminal cases. *See State v. Collins*, 265 Md. 70, 78–79, 288 A.2d 163 (1972); *Kardy v. Shook*, 237 Md. 524, 540–41, 207 A.2d 83 (1965). In addition, Maryland courts have no inherent power to direct the taking of depositions in

---

10. Indeed, Tharp would have no standing to contend that his right to a public trial was violated because his attorney was excluded, albeit erroneously, from Sellers's trial a year earlier. *See Turner v. State*, 299 Md. 565, 474 A.2d 1297 (1984) ("As a general rule, a person may not assert the constitutional rights of others.").

criminal cases; whatever power exists is conferred by Rule 4–261, "which derogates the common law and must be strictly construed." *Collins*, 265 Md. at 78, 288 A.2d 163. Rule 4–261, which applies to depositions in criminal cases, states in pertinent part:

> (b) *Availability in circuit court.* In a circuit court the parties may agree, without an order, to take a deposition of a witness, subject to the right of the witness to move for a protective order under section (g) of this Rule. Without agreement, the court, on motion of a party, may order that the testimony of a witness be taken by deposition if satisfied that the witness may be unable to attend a trial or hearing, that the testimony may be material, and that the taking of the deposition is necessary to prevent a failure of justice.

Clearly, the rule does not permit depositions in the circumstances of this case. Here, Tharp wanted to depose those witnesses who *would be testifying* in his case, not those who "may be unable to attend" the trial. Moreover, there was no indication that the testimony he sought would be in any way "material." Indeed, Tharp's admitted purpose for seeking the depositions was simply to "observe" the witnesses to gather information that would not have been "covered in a transcript," such as "how someone testifies, body language, credibility, those sorts of things." While the substantive testimony resulting from the depositions might be helpful to Tharp, as well, there was no indication that Tharp was actively seeking testimony from these witnesses beyond what was revealed in Sellers's trial transcript. Moreover, we do not find that the depositions were "necessary to prevent a failure of justice." As we have mentioned, Tharp obtained a copy of the transcript from the Sellers case for use in preparing for his own trial. Moreover, the record does not disclose whether any witnesses, other than William Minton, testified in both trials.

Finally, we note that, even if denying the request to conduct depositions amounted to some conceivable error, Tharp fails to provide this Court with any facts or argument demonstrating how the court's denial of his request harmed

his case.[11]  Simply *complaining that the State had an opportunity that the defense did not, without more, does not constitute harm or unfair prejudice requiring a reversal and/or remand.* See Dorsey v. State, 276 Md. 638, 350 A.2d 665 (1976).  Here, Tharp simply argues that the defense "cannot recover" the advantage of having observed witnesses testify in the Sellers case who would later testify in Tharp's case.  On the record before us, we find that this "disadvantage" in no way influenced the verdict in Tharp's case, particularly in light of the extensive evidence presented by the State at trial.  Therefore, we find that the court's denial of Tharp's request to conduct depositions, even if it was erroneous, was harmless beyond a reasonable doubt.

### III.  Cross-examination Regarding Presence of Witness's Attorney in Courtroom

██  William Minton, Tharp's co-defendant, testified for the State pursuant to a plea agreement under which the State agreed to drop the first degree murder charge against Minton and recommend a thirty-year sentence in return for Minton's testimony against Tharp and a plea of guilty to second degree murder.  Tharp contends on appeal that the trial court erroneously prevented him from cross-examining Minton about the fact that Minton's attorney was in the courtroom during Minton's testimony.[12]  We find that the court properly exercised its discretion in controlling the scope of cross-examination.

██  "The right to cross-examine a witness is not absolute; it may be restricted by the trial judge." *Stouffer v.*

---

**11.**  For example, Tharp does not contend that a witness's testimony surprised him at trial, or that the State pursued an unanticipated line of questioning for which he could have prepared had Mr. Barry observed the Sellers trial or deposed the common witnesses.

**12.**  Defense counsel began Minton's cross-examination with the question: "Mr. Minton, there's a gentleman seated directly behind me wearing a blue and yellow tie.  Who is that?"  Counsel indicated in the subsequent bench conference that the gentleman was Minton's attorney.

*State,* 118 Md.App. 590, 625, 703 A.2d 861 (1997), *aff'd in part, rev'd in part on other grounds,* 352 Md. 97, 721 A.2d 207 (1998) (citing *Leeks v. State* 110 Md.App. 543, 554, 678 A.2d 80 (1996)). Whether questions will be permitted on cross-examination and the determination of their relevance are matters reserved for the sound discretion of the trial court. *Id.* at 625, 703 A.2d 861 (citing *Waldron v. State,* 62 Md.App. 686, 696, 491 A.2d 595, *cert. denied,* 304 Md. 97, 497 A.2d 819 (1985)); *see also Ebb v. State,* 341 Md. 578, 587, 671 A.2d 974, *cert. denied,* 519 U.S. 832, 117 S.Ct. 102, 136 L.Ed.2d 56 (1996). On appeal, we will only disturb the trial court's decision upon a showing of prejudicial abuse of discretion. *See Nottingham Village, Inc. v. Baltimore County,* 266 Md. 339, 356, 292 A.2d 680 (1972); *Simpson v. State,* 121 Md.App. 263, 708 A.2d 1126 (1998) ("The scope of cross-examination is within the sound discretion of the trial court and ordinarily will not be disturbed unless there is an abuse of discretion.") (citing *Oken v. State,* 327 Md. 628, 669, 612 A.2d 258 (1992), *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993)); *Boyer v. State,* 107 Md.App. 32, 57–58, 666 A.2d 1269 (1995), *cert. denied,* 341 Md. 647, 672 A.2d 622 (1996). As the Court of Appeals indicated in *Merzbacher v. State,* "our sole function on appellate review is to determine whether the trial judge imposed limitations upon cross-examination that inhibited the ability of the defendant to receive a fair trial." 346 Md. 391, 413, 697 A.2d 432 (1997).

When defense counsel began to ask Minton about the presence of his attorney, the State objected. At the bench, the following colloquy ensued:

[DEFENSE COUNSEL]: I think the jury has a right to know the entire circumstance, including that his attorney is here, what his attorney is doing here, what he thinks his attorney is doing here.

THE COURT: What difference does it make what he thinks his attorney is doing here?

[DEFENSE COUNSEL]: I think [it] makes the same difference as to does, what does he think the plea agree-

ment was, whether his perception's accurate or not. His perception of it is what's important.

THE COURT: What was the basis of the objection?

[THE PROSECUTOR]: It's irrelevant. For some reason that's going to make him look bad because he has an attorney? That could be the only spin that I could see. And that has nothing to do with the facts of what he's testifying to.

THE COURT: Mr. Barry [defense counsel]?

[DEFENSE COUNSEL]: Yes, ma'am.

THE COURT: Why don't you—do you want the jury to know what Mr. Maxwell [Minton's counsel] is—

[DEFENSE COUNSEL]: Yes. Because I think that they have the right to know the circumstances of what he's doing, what he's testifying. If he does have this lawyer here, that his lawyer is watching out for him, that there is some concern about what he's going to say, that people are watching what he is saying. Your Honor's going to sentence him and [Y]our Honor is watching what he's saying; [the prosecutor] Mr. Meyer's watching—

THE COURT: Mm-hmm.

[DEFENSE COUNSEL]:—what he's saying because he's going to make recommendations an[d] his lawyer is here to advise him about that.

THE COURT: Well, I haven't heard his lawyer give him one word of advice today. Not a word.

[DEFENSE COUNSEL]: Agreed.

THE COURT: Sustain the objection.

We are unclear how the fact that "people are watching" the testimony was relevant to Minton's credibility or any other aspect of this case. We cannot say that not permitting defense counsel to cross-examine Minton about the fact that his attorney was in the courtroom deprived Tharp of a fair trial. This is particularly so in light of the fact that the trial court permitted full exploration of the terms of Minton's plea agreement with the State. Therefore, we find that the court

properly exercised its discretion when it refused to allow Tharp to cross-examine Minton as to the presence of his attorney.

## IV. Sufficiency of the Evidence

Tharp's final argument is that the evidence at trial was insufficient to sustain his convictions for armed robbery and robbery because the evidence failed to prove that he acted with the requisite intent to steal. Presumably, Tharp further contends that the trial court erred in denying his motion for judgment of acquittal on that basis, and asks us to reverse his convictions.[13] We decline to do so.

Evidence is sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 313, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also Dawson v. State,* 329 Md. 275, 281, 619 A.2d 111 (1993). The limited question before an appellate court "is not whether the evidence *should have or probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder." *Fraidin v. State,* 85 Md.App. 231, 241, 583 A.2d 1065, *cert. denied,* 322 Md. 614, 589 A.2d 57 (1991).

Tharp asserts that "his awareness that Mr. Keller did not get paid on the day of the attack was undisputed." Based on this, Tharp insists that the jury could not reasonably have concluded that he harbored the intent to rob Keller. We disagree. Minton testified that Sellers, Minton, and Tharp planned to rob Keller. The jury could reasonably have concluded that, even if Keller had no money, Tharp and the

---

13. Tharp's treatment of this issue in his brief is quite cursory; he simply reviews the elements of robbery and argues that the evidence could not support a finding that Tharp had the requisite intent.

others planned to rob him of other personal items, such as his jewelry and wallet—as indeed they did.[14] Thus, we find that a rational fact-finder could have found the essential elements of robbery beyond a reasonable doubt. *See Jackson,* 443 U.S. at 313, 99 S.Ct. 2781, 61 L.Ed.2d 560. Accordingly, we affirm Tharp's convictions.

### *Conclusion*

We find that the trial court properly refused to instruct the jury as to the crime of accessory after the fact. The court erroneously excluded defense counsel from the courtroom in a codefendant's trial when counsel was excepted from the motion to sequester, but we find that the error was harmless. We further find that the court did not abuse its discretion in limiting the scope of cross-examination in this case. Finally, we find that the evidence was legally sufficient to sustain Tharp's convictions for robbery. We therefore affirm.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

---

**14.** Even if the intent to rob Keller of these other items was not formed until after the attack had begun, such an intent would be sufficient to sustain Tharp's convictions. To convict a defendant of robbery, the State must prove that the defendant took property from the victim by force or threat of force and that, "at the time the defendant took the property from the victim, he intended to deprive the victim of the property permanently." *Higginbotham v. State,* 104 Md.App. 145, 158, 655 A.2d 1282 (1995).